# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROBERT GLADSTONE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0867-PAF |
| | ) | |
| EBC HOLDINGS, INC. and | ) | |
| FIREBRAND FINANCIAL | ) | |
| GROUP, | ) | |
| INC., | ) | |
| | ) | |
| Respondents. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: November 11, 2025
Date Decided: August 7, 2026

Martin S. Lessner, Nicholas J. Rohrer, Elisabeth S. Bradley, Skyler A. C. Speed, Zeliang Liu, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Attorneys for Petitioner Robert Gladstone*

John M. Seaman, Christopher Fitzpatrick Cannataro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Susan J. Schwartz, FOLEY & LARDNER LLP, New York, New York; Beth I.Z. Boland, FOLEY & LARDNER LLP, Boston, Massachusetts; *Attorneys for Respondents EBC Holdings, Inc. and Firebrand Financial Group, Inc.*

**FIORAVANTI, Vice Chancellor**

This statutory appraisal action arises from a stock-for-stock reorganization that collapsed a dual holding-company structure above a boutique broker-dealer specializing in the underwriting of special purpose acquisition companies. The petitioner perfected appraisal rights and seeks a judicial determination of fair value under Section 262 of the Delaware General Corporation Law (the "DGCL").

The parties offered starkly different valuations. In this post-trial opinion, the court concludes that an adjusted version of the petitioner's capitalization approach provides the better framework. After modifying the operating inputs, accounting for the cash required to support the operating company's regulated business, valuing the securities portfolio, deducting the subordinated loan, and applying the appropriate cross-ownership allocation, the court determines that the fair value of the corporation's common stock as of the merger date was approximately $11.08 per share.

## I.     BACKGROUND

These are the facts as the court finds them after trial.[1]

---

[1] Other factual findings are contained in the analysis section of the opinion. Deposition testimony is cited as "(Surname) Dep."; trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the docket number and the relevant section, page, paragraph, or exhibit. Citations to testimony presented at trial are in the form "Tr. # (X)," with "X" representing the surname of the speaker. Citations to the transcript of post-trial oral argument (Dkt. 136) are in the form of "Post-Trial Arg." After being identified initially, individuals are

## A. The Parties and Relevant Non-Parties

Firebrand Financial Group, Inc. ("Firebrand" or the "Company") was a Delaware holding corporation.[2] Its principal asset was a majority interest in EBC Holdings Inc. ("EBCH" and, together with Firebrand, the "Respondents"), a New York holding corporation.[3] EBCH's principal operating asset was its wholly owned subsidiary, EarlyBirdCapital, Inc. ("EarlyBird"), a boutique investment bank and registered broker-dealer.[4] On June 1, 2022, Firebrand merged into EBCH (the "Merger").[5]

Firebrand, EBCH, and EarlyBird shared a common senior management team. At the time of the Merger, David Nussbaum chaired the boards of all three entities.[6] Steven Levine was the Chief Executive Officer ("CEO") and Michelle Pendergast

---

referenced herein by their surnames without regard to honorifics. Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs. When resolving factual disputes, this decision generally gives more weight to contemporaneous evidence. *See Lynch v. Gonzalez*, 2020 WL 4381604, at *5 (Del. Ch. July 31, 2020) ("The relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact." (citation modified)), *aff'd*, 253 A.3d 556 (Del. 2021) (TABLE); *see, e.g.*, *BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *2 (Del. Ch. Feb. 2, 2022) ("The witness testimony often conflicted with the contemporaneous record. In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents.").

[2] PTO ¶¶ 26, 35.

[3] *Id.* ¶¶ 35, 43.

[4] *Id.* ¶¶ 40, 45.

[5] *Id.* ¶ 1.

[6] *Id.* ¶ 50.

was the Chief Financial Officer of all three entities.[7]  Levine was also a director of all three companies.[8]

Robert Gladstone (the "Petitioner") has worked at EarlyBird or its affiliates since 1990, when he joined the predecessor firm that ultimately became EarlyBird.[9] Petitioner perfected statutory appraisal rights as to 693,165 shares of Firebrand common stock held in record name.[10]

### B.    The Cross-Ownership Structure

Firebrand and EBCH had a circular ownership structure, with each holding shares of the other.  In connection with the Merger, Firebrand reconciled its capitalization table to reflect 14,430,614 total shares of common stock.[11]  Of those shares, EBCH held 7,096,210 (the "Disputed Shares"), Firebrand held 17,500, and outside Firebrand stockholders held the remaining 7,316,904.[12]  In turn, Firebrand held 20,000,000 shares of EBCH common stock, representing approximately 81.5%

---

[7] *Id.* ¶¶ 53, 59; Tr. 188:16−19, 189:1−9 (Pendergast); Pendergast Dep. 31:3−13.

[8] PTO ¶ 53.

[9] *Id.* ¶ 23; Tr. 6:19–7:2 (Gladstone).

[10] PTO ¶ 25.

[11] JX 230a Tab "Merger Calculations" Cells A1–B1; Tr. 200:10–12 (Pendergast); *see also* JX 308.  Prior to the reconciliation, Firebrand's records did not accurately reflect the number of shares; a variety of sources incorrectly indicated 14,794,267 as the total number of shares of Firebrand common stock.  *See* Tr. 196:13–16 (Pendergast); JX 188; JX 267.

[12] *See* JX 355a Tab "FFGI Pre-Merger" Cells E49, E53, E55.

of EBCH's equity on an as-converted basis.[13]  The parties dispute how the Firebrand shares held by EBCH should be treated in determining the merger consideration attributable to Firebrand's outside stockholders.  The court refers to this disagreement as the "Share Dispute."

### C.    The Nature of Firebrand's Operating Business

#### 1.    EarlyBird

##### a.    EarlyBird's SPAC-centric business model

EarlyBird's business focuses exclusively on underwriting initial public offerings ("IPOs") conducted through special purpose acquisition companies ("SPACs").[14]  EarlyBird identifies sponsor teams, assists with the regulatory procedures, and helps identify potential acquisition targets.[15]

EarlyBird's primary source of revenue is SPAC underwriting fees.[16] Historically, EarlyBird received a front-end fee of approximately 2% of the amount raised in a SPAC IPO and a deferred fee of approximately 3.5% to 4%, payable upon the closing of a business combination, or a de-SPAC transaction.[17]  EarlyBird

---

[13] PTO ¶ 43.

[14] PTO ¶ 46; Tr. 7:13−21, 10:7−11 (Gladstone).

[15] Tr. 7:22−8:7, 8:23−9:3 (Gladstone).

[16] PTO ¶¶ 76−77; Tr. 8:8−12 (Gladstone).

[17] Tr. 8:8−12 (Gladstone); Nussbaum Dep. 37:6−8.

sometimes accepted notes or issuer stock in partial payment of the deferred fee.[18]

As competition increased, sponsors required EarlyBird to "have a stake in the outcome of the business combination" by deferring part of its compensation or reinvesting a portion of its front-end fees in the SPAC.[19]

EarlyBird thus received compensation in both cash and SPAC securities.[20] Those securities included shares or units purchased at $10 each and representative or founder shares acquired for nominal consideration. The securities generally lacked redemption rights and would become worthless if the SPAC did not complete a business combination.[21] These securities also remained unregistered and nonmarketable before a business combination and were subject to lock-up restrictions.[22]

EarlyBird's valuation of its securities changed over time. Historically, it carried these securities on the books at zero value.[23] That changed in 2021, when EarlyBird retained Marcum LLP ("Marcum") as its new auditor and engaged Cassel Salpeter & Co. ("Cassel") to value its nonmarketable securities for financial

---

[18] Levine Dep. 25:5−7.

[19] Tr. 140:9−24 (Levine); *see also* JX 68 at 20.

[20] Tr. 141:17–22, 142:13–16 (Levine).

[21] *Id.* at 44:12−16, 45:7−15 (Gladstone); *id.* at 142:7–23 (Levine); *id.* at 209:2−5 (Pendergast).

[22] *Id.* at 142:19–23 (Levine).

[23] *Id*. at 149:10–11.

reporting purposes.[24]  Cassel performed two valuations a year:  a formal January 31 valuation for the annual audit and a less formal July 31 mid-year valuation.[25]  Cassel prepared its first valuation as of January 31, 2021.[26]  Pendergast began recording Cassel's conclusions in EarlyBird's internal schedules and worked with Cassel during the semiannual valuation process.[27]  EarlyBird also monitored the market prices of its SPAC securities using information obtained by its analysts from SPACInsider, a data and analytics platform focused on the SPAC market.[28]

### b.    Regulatory requirements

#### i.    The Net Capital Rule and underwriting commitments

EarlyBird is subject to oversight by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").[29]  As a

---

[24] *Id.* at 149:6−20; Pendergast Dep. 29:5−7, 29:17−20, 30:15−19.

[25] Tr. 151:5−152:6 (Levine); Pendergast Dep. 94:3−6, 94:11−20; *see, e.g.*, JX 110; JX 148; JX 352.

[26] JX 110; Pendergast Dep. 94:8−12.

[27] Tr. 206:7−13 (Pendergast).

[28] *Id.* at 206:14−20, 207:1−6.

[29] PTO ¶¶ 45, 78; Tr. 95:7−13 (Nussbaum).  Section 3(a)(5)(A) of the Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise."  JX 402 ("Carr Report") ¶ 18.  Broker-dealers are generally required to register with the SEC under Section 15(a)(1) of the Exchange Act. *Id.* ¶ 19.  Broker-dealers must register before selling both registered and unregistered securities, including private placements or Regulation D offerings.  *Id.*  Before a broker-dealer begins doing business, it must become a member of a self-regulatory organization

6

registered broker-dealer, EarlyBird is subject to Rule 15c3-1 of the Securities Exchange Act of 1934 (the "Net Capital Rule"), which requires it to maintain a minimum regulatory net capital at all times.[30]  The net capital computation begins with the broker-dealer's equity under generally accepted accounting principles and then applies deductions and adjustments required by the rule.[31]  For purposes of the computation, assets are classified as allowable or nonallowable.[32]  The rule accounts for market and transactional risks by requiring specified deductions—commonly referred to as "haircuts"—for certain securities positions and contractual commitments.[33]  The size of the haircut depends on the type and risk characteristics of the asset or commitment.[34]  Cash and certain short-term liquid assets are fully allowable and are not subject to haircuts.[35]  Other assets may be allowable in part,

---

("SRO").  *Id.* ¶ 21.  SROs assist the SEC in regulating the activities of broker-dealers.  *Id.* FINRA and the national securities exchanges are all SROs.  *Id.*; *see also* Tr. 400:12−18, 401:2−4 (Carr).

[30] 17 C.F.R. § 240.15c3-1; Carr Report ¶¶ 17(a), 23; Tr. 95:14−22 (Nussbaum); *id.* at 210:8−13, 210:22−211:2 (Pendergast); *id.* at 401:9−402:2, 406:6−12 (Carr).  The Net Capital Rule "was adopted under the 1934 Act in order to create a uniform capital requirement for all registered broker-dealers and to ensure the liquidity of broker-dealers." American Institute of Certified Public Accountants, *Accounting Guide:  Brokers and Dealers in Securities* §3.41 (Aug. 1, 2019).

[31] Carr Report ¶¶ 29−30; Tr. 402:10−18 (Carr).

[32] Tr. 411:19−412:6, 424:5−13 (Carr).

[33] Carr Report ¶¶ 37, 43; Tr. 403:2−8 (Carr).

[34] Carr Report ¶ 37; Tr. 424:5−13 (Carr).

[35] Carr Report ¶ 44.

with haircuts that reduce the amount of regulatory net capital available.[36] Nonmarketable securities are subject to a 100% haircut and do not contribute to regulatory net capital.[37]

Broker-dealers commonly maintain excess net capital in addition to the regulatory minimum.[38] In practice, broker-dealers may satisfy their net capital requirement through a combination of cash, other allowable assets, and qualifying subordinated loans, subject to FINRA's limitations on short-term subordinated borrowings (including the frequency limits applicable to short-term loans).[39]

Under the Net Capital Rule, firm-commitment underwriting obligations are treated as "open contractual commitments" and are therefore subject to haircuts.[40] When a broker-dealer commits to purchase securities that are not yet listed or trading—such as shares in an IPO—the rule requires a deduction equal to 30% of the value of the securities subject to the broker-dealer's underwriting commitment.[41] If multiple underwriters participate through a syndicate, the deduction is allocated

---

[36] *Id.* ¶¶ 39−41; Tr. 402:14−22, 403:9−16 (Carr).

[37] Carr Report ¶ 42; Tr. 403:17−404:2 (Carr).

[38] *See* Tr. 409:6−16 (Carr).

[39] Carr Report ¶¶ 34−35; Tr. 96:21−24 (Nussbaum); *id.* at 416:2−12, 417:21−418:12, 424:14−425:12 (Carr).

[40] Carr Report ¶¶ 46−47; Tr. 404:3−12 (Carr).

[41] Tr. 404:13−22 (Carr).

among them.[42]  The requirement applies from the time the underwriting commitment becomes effective or irrevocable until the distribution of the IPO shares is completed.[43]  Accordingly, underwriting-related net capital needs arise during the offering period, but the required amount varies with the size and timing of the underwriting activity rather than remaining fixed at a constant level.

EarlyBird typically satisfied underwriting-related net capital requirements by maintaining regulatory capital in cash or short-term market accounts, in part because other assets were subject to haircuts.[44]  EarlyBird could also obtain capital through 45-day subordinated loans bearing interest at a 1% monthly rate.[45]  When EarlyBird lacked sufficient cash, it would first seek to raise funds internally to avoid borrowing costs, though such contributions were rare.[46]

EarlyBird historically aimed to maintain $30 million in cash or cash equivalents, though balances fluctuated.  As of May 31, 2022—one day before the Merger—EarlyBird reported $6,784,564 of cash, $71,976,493 of net capital, $694,018 of minimum net capital, and $71,282,475 of excess net capital.[47]

---

[42] Carr Report ¶ 50.

[43] *Id.* ¶ 48; Tr. 404:23−405:7 (Carr).

[44] Tr. 96:12−20 (Nussbaum).

[45] *Id.* at 97:7−13.

[46] *Id.* at 97:20−24, 98:8−14.

[47] JX 224 at 2, 4−5 Nos. 1, 10−11, 14.

### ii. Reporting obligations

As a broker-dealer, EarlyBird is required to periodically file a Financial and Operational Combined Uniform Single Report (or SEC Form X-17A-5, "FOCUS Report") with the SEC and FINRA.[48] A FOCUS Report is a "basic financial and operational report required of those brokers or dealers subject to any minimum net capital requirements" under the Net Capital Rule.[49] EarlyBird filed a FOCUS Report monthly.[50]

EarlyBird is also required to file an audited annual financial statement with the SEC within 60 calendar days after the end of its fiscal year.[51] As the ultimate parent entity, Firebrand's audited financial statements consolidated EBCH and EarlyBird, with a fiscal year-end date of January 31.[52] Firebrand's financial statements indicated that restricted shares, options, and warrants constituted a

---

[48] 17 C.F.R. § 240.17a-5(a).

[49] U.S. Securities and Exchange Commission, Form X-17A-5 Part IIA (FOCUS Report), General Instructions 1 (Nov. 2019).

[50] Tr. 211:3−14 (Pendergast). Pendergast prepares those filings, which contain EarlyBird's financials and the net capital calculation. *Id.* at 215:1−11; *id.* at 180:19−181:1 (Levine).

[51] 17 C.F.R. § 240.17a-5(d); Tr. 211:9−22 (Pendergast).

[52] PTO ¶ 34; *see* JX 393 ("Margolin Report") ¶ 10.

significant asset on its balance sheet.  EarlyBird tracked these securities' prices over time.[53]

### iii.    Trading restrictions and withdrawals

EarlyBird is not a market maker in its SPAC securities; instead, it employs a trader dedicated to marketing them.[54]  FINRA imposes a 180-day lock-up on the representative shares and the public units that EarlyBird receives.[55]  Withdrawals of capital, including for dividend distribution purposes, are subject to FINRA approval.[56]

### 2.    The rise of SPACs and the regulatory response

The SPAC market expanded in 2019,[57] accelerated dramatically in 2020, and peaked in 2021.[58]  EarlyBird completed 29 SPAC IPOs in 2021, its strongest year on record.  The positive outlook on the SPAC market is reflected in the valuation of EarlyBird's nonmarketable securities portfolio during that period, which Cassel valued at approximately $36.9 million as of January 31, 2022.[59]

---

[53] JX 83 Tab "Investment Holdings 5-31-2022" Columns M, AC–AG (reflecting trading price as of the first day of each month for January through June 2022); *see* Tr. 148:9−149:3 (Levine) (describing tracking the cost-basis for the securities).

[54] Tr. 170:5−9 (Levine).

[55] *Id.* at 171:17−172:19 (Levine); *see* JX 1051 at 150.

[56] Tr. 406:1−5 (Carr).

[57] *Id.* at 135:9−17 (Levine).

[58] *Id.* at 33:11−14, 47:20−48:1 (Gladstone).

[59] JX 148 at 20.

By late 2021, management recognized that the SPAC cycle had already peaked and that it had "missed the window" to sell EarlyBird during the strongest part of the up cycle.[60] Management nevertheless explored a potential sale and approached Jefferies LLC ("Jefferies") to serve as its financial adviser.[61] In January 2022, Jefferies prepared discussion materials that adopted a "Buyer View," which significantly discounted management's expectations.[62] Jefferies lacked management's optimism because the SPAC market had already "experienced a cyclical high" and buyers "may be hesitant to pay a multiple off of the high earnings run rate."[63] Even so, the Jefferies materials illustrated a valuation range of $125 million to $175 million.[64]

By early 2022, the broader public equity markets had weakened, and the SPAC market had begun to slow.[65] In March 2022, the SEC announced proposed rules "to enhance disclosure and investor protection" in SPAC IPOs and de-SPAC

---

[60] Nussbaum Dep. 115:14–117:1.

[61] JX 140 at 1; Nussbaum Dep. 111:6–16.

[62] PTO ¶ 64; JX 147.

[63] JX 147 at 2.

[64] *Id.* at 4.

[65] Tr. 33:15−22, 34:20−35:14, 48:2−5, 49:10−21 (Gladstone). EarlyBird completed only three SPAC IPOs during the first quarter of 2022. *Id.* at 104:22−24 (Nussbaum).

12

transactions.[66]  The proposed rules threatened to impose new liabilities on SPAC underwriters and, according to EarlyBird's management, materially worsened market conditions, prompting several investment banks and sponsors to exit the business.[67]  According to Nussbaum, EarlyBird responded by entering "crisis management mode" and holding daily internal meetings.[68]  Nussbaum and Levine expected the SEC's proposed rules to cost EarlyBird approximately $150,000 in additional expenses per underwriting.[69]

### 3. The Merger

In early 2022, Nussbaum and Levine decided to implement their long-term plan to consolidate Firebrand and EBCH, which would simplify the corporate structure, permit the issuance of options, and avoid potential double taxation.[70]  In

---

[66] U.S. Securities and Exchange Commission, SEC Proposes Rules to Enhance Disclosure and Investor Protection Relating to Special Purpose Acquisition Companies, Shell Companies, and Projections (Mar. 30, 2022) https://www.sec.gov/newsroom/press-releases/2022-56.  The court takes judicial notice of this announcement.  D.R.E. 201(b)(2).

[67] Tr. 51:11−14, 51:19−52:2 (Gladstone); *id.* at 137:7−138:15 (Levine); *id.* at 105:9−13 (Nussbaum); Nussbaum Dep. 101:3−16.  Nussbaum described the proposal as contributing to an "implo[sion] [of] the SPAC market."  Nussbaum Dep. 101:5; *see also* Tr. 135:23−136:7, 136:13−14 (Levine).

[68] Tr. 105:9−12 (Nussbaum); *id.* at 32:9−33:2 (Gladstone).

[69] *Id.* at 106:1−5 (Nussbaum); *id.* at 136:17−22 (Levine).

[70] *Id.* at 85:24−89:1 (Nussbaum); *id.* at 133:13−134:4 (Levine); *see id.* at 86:10−87:1 (Nussbaum) (testifying that the process took roughly 18 months from the moment management consulted the auditor and counsel until the merger was executed).  By then, Firebrand owned 80.21% of EBCH.  *See* JX 41 at 7.  Firebrand still had a $25 million net

13

setting the exchange ratio for the stock-for-stock merger, management did not commission a fairness opinion or merger-specific valuation of Firebrand.[71] Instead, it relied in part on the most recent Cassel valuation of EarlyBird's nonmarketable securities as of January 31, 2022, which had been prepared for financial reporting purposes.[72]

On March 14, 2022, Firebrand and EBCH entered into an Agreement and Plan of Reorganization (the "Merger Agreement"), pursuant to which Firebrand would merge with and into EBCH, with EBCH surviving.[73] The respective stockholder approvals were obtained that same day by written consent.[74]

Section 2.01 of the Merger Agreement stated that each outstanding Firebrand share would be converted into a number of EBCH shares calculated by dividing the 20,000,000 EBCH shares held by Firebrand by the number of Firebrand shares

---

operating loss carryforward from the early 2000s. Tr. 86:8−11 (Nussbaum). Management had used those losses between 2015 and 2019 to offset federal tax liability generated by EarlyBird's profitable operations. *Id.* at 86:12−14.

[71] JX 194 at 3. *See* Tr. 134:11–23 (Levine) (testifying that no valuation was performed because the only result of the Merger was simplification of the corporate structure).

[72] JX 148 at 20; Margolin Report ¶¶ 26–27; Tr. 52:21−53:1 (Gladstone).

[73] PTO ¶ 2; JX 195 (the "Merger Agreement"). The Merger Agreement incorrectly represented that Firebrand had 14,794,267 shares of common stock issued and outstanding. *See* Merger Agreement at 1. On May 19, 2022, counsel circulated an updated stockholder ledger, which indicated 14,430,614 outstanding Firebrand shares for purposes of the exchange ratio. JX 230 at 1; JX 230a Tab "Common Post-Merger" Rows 14, 15, 43, Cell E84; *see also* Tr. 199:9−16, 199:24−200:6 (Pendergast). The parties do not dispute the corrected number of total shares.

[74] PTO ¶ 3; JX 199 at 3−4.

outstanding immediately before closing. For purposes of the calculation, Section 2.01 treated the Firebrand shares held by EBCH and its wholly owned subsidiaries as "issued and outstanding."[75] Elsewhere, in Section 2.04, "Treasury Stock" was defined as Firebrand shares held by Firebrand or its wholly owned subsidiaries, other than EBCH and EBCH's subsidiaries.[76] The Merger Agreement included the EBCH-held Firebrand shares in the exchange-ratio denominator and provided for their cancellation at closing.[77]

Contemporaneous records also reflected the value assigned to EarlyBird's securities portfolio immediately before the Merger. EarlyBird's May 31, 2022, FOCUS Report reported approximately $38.8 million in "[s]ecurities and/or other investments not readily marketable" "[a]t estimated fair value" and approximately $6.1 million in "[o]ther securities," for a combined total of approximately $44.9 million.[78] Pendergast's May 31 securities schedule reflected the same amounts.[79]

---

[75] Merger Agreement § 2.01; Tr. 195:13−20 (Pendergast).

[76] Merger Agreement § 2.04.

[77] *Id.*

[78] JX 224 at 2; Tr. 181:2−7 (Levine); *id.* at 216:7−12, 216:19−217:3 (Pendergast).

[79] Tr. 217:9−218:15, 219:6−220:1 (Pendergast); *see* JX 83.

The Merger became effective on June 1, 2022 (the "Merger Date").[80] At closing, the Firebrand shares held by EBCH were canceled.[81] On July 8, 2022, Pendergast notified the former Firebrand stockholders that each Firebrand share had been converted into approximately 1.385942 shares of EBCH common stock.[82]

### 4. Post-Merger developments

#### a. The EBCH dividend distribution

Before the Merger closed, Nussbaum and Levine considered making a cash distribution to EBCH's stockholders.[83] They wanted to distribute as much cash as possible, but Pendergast urged retaining additional capital to address potential losses and liabilities.[84]

Shortly after the Merger, EBCH approved a dividend of $3.20 per share.[85] In seeking preferred stockholders' consent, EBCH represented that its "remaining

---

[80] PTO ¶ 1.

[81] Merger Agreement § 2.04.

[82] PTO ¶ 10.

[83] Tr. 99:16−100:17, 100:23−101:8 (Nussbaum). Nussbaum testified that management's interest in distributing cash was tied to its view that the business could no longer be sold on favorable terms. *Id.* According to Nussbaum, management had hoped from 2019 through the Merger Date to sell the business while the SPAC market remained strong, but that strategy collapsed in 2022 as the market deteriorated and the SEC's proposed SPAC rules raised the possibility of substantial underwriter liability. *Id.* In his view, by June 2022, those developments made a sale of the business no longer realistic. *Id.*

[84] *Id.* at 102:2−11; *see also id.* at 102:13−18 (indicating that Nussbaum also considered whether EBCH could liquidate approximately $45 million in restricted sponsor shares reflected on the balance sheet).

[85] PTO ¶¶ 85−86.

working capital, when combined with available funding sources, [would] be sufficient to support underwritings for the foreseeable future."[86]  On August 19, 2022, EarlyBird sought FINRA authorization to withdraw $45 million for payment to EBCH.[87]  The filing reported approximately $73.1 million in excess net capital.[88]  EarlyBird ultimately transferred approximately $45 million to EBCH,[89] and EBCH distributed approximately $43.8 million to its stockholders.[90]

### b. The post-Merger reassessment of the securities portfolio

The SPAC market continued to deteriorate after the Merger.  SPAC volume and de-SPAC completion rates declined, underwriting fees compressed, and expected diligence burdens increased.[91]  In August 2022, management began questioning whether Cassel's existing methodology accurately reflected the value of EarlyBird's nonmarketable securities.  On August 12, Cassel circulated an "initial

---

[86] JX 282 at 1.

[87] JX 454.

[88] *Id.* at 2.

[89] JX 455.

[90] Tr. 99:14−15, 100:17−22 (Nussbaum); JX 336 at 1, 3; *see* JX 282 at 1–2; *see also* Margolin Report ¶ 24 & n.17.  Petitioner received the dividend on the 150,000 shares of EBCH common stock that he had owned prior to the Merger.  Gladstone Dep. 252:8−12.

[91] *See* JX 400; Tr. 105:1−2, 106:15−16 (Nussbaum); *id.* at 209:6−8 (Pendergast); Nussbaum Dep. 101:17−20; Tr. 98:17−24, 105:14−17 (Nussbaum) (describing that the gross fee would be used to pay bankers (50%), counsel (20%), leaving the underwriter with 30% of the net fee); *id.* at 136:14−137:6, 141:11−17 (Levine); *contra id.* at 33:23−34:5 (Gladstone) (testifying that EarlyBird completed five SPACs in the first quarter of 2022 and about the same amount in the following quarter).

draft spreadsheet" for its July 31, 2022 mid-year valuation, which estimated EarlyBird's portfolio value at approximately $29.6 million.[92] Six days later, "after various conversations with and without Marcum," Cassel issued a "revised analysis utilizing substantially reduced probabilities of De-SPACing," which reduced the estimated value to approximately $5.6 million.[93] The revised approach used the trading prices of SPAC rights as a market-based reference for pricing EarlyBird's restricted securities.[94]

## II. ANALYSIS

Petitioner has perfected his appraisal rights for 693,165 shares of Firebrand common stock under Section 262 of the DGCL.[95]

### A. The Legal Standard

A statutory appraisal proceeding provides stockholders that dissent from a merger an opportunity to receive a judicial determination of the fair value of their shares. *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1142 (Del. 1989). The operative statutory provision, Section 262 of the DGCL, requires the court to

> determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger [or] consolidation, . . . together with interest, if any, to be paid upon the

---

[92] JX 322a Tab "Summary" Cell X59.

[93] JX 331 Tab "Summary" Cell X59.

[94] *Id.* Tab "Summary"; JX 324 at 1.

[95] Petitioner demanded appraisal for 736,875 shares of Firebrand common stock, but perfected his appraisal rights for only 693,165 shares. PTO ¶¶ 9, 25.

> amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.

8 *Del. C.* § 262(h). The court must value the company as a "going concern based upon the operative reality of the company as of the time of the merger." *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525 (Del. 1999) (citation modified). This is because "[t]he underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred. Consequently . . . the corporation must be valued as an operating entity." *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000).

"In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of evidence." *M.G. Bancorporation*, 737 A.2d at 520. "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015) (citation modified), *aff'd*, 137 A.3d 970 (Del. 2016). "'If both parties fail to meet the preponderance standard on the ultimate question of fair value, the Court is required under the statute to make its own determination.'" *In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 550 (Del. Ch. 2014) (quoting Jesse A. Finkelstein & John D. Hendershot, *Appraisal*

*Rights in Mergers and Consolidations*, 38–5th C.P.S. §§ IV(H)(3), at A–89 to A–90 (BNA) (collecting cases)).

"The Court of Chancery may 'adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record.'" *Jacobs v. Akademos, Inc.*, 326 A.3d 711, 736 (Del. Ch. 2024) (quoting *M.G. Bancorporation*, 737 A.2d at 526), *aff'd*, 342 A.3d 1165 (Del. 2025). "Or the court 'may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation.'" *Id.* (quoting Finkelstein & Hendershot, *Appraisal Rights in Mergers and Consolidations*, 38-5th C.P.S. § V(A), at A-31 (BNA, Supp. 2010 & 2017) (collecting cases)).

The valuation date is the date on which the merger closes. *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1187 (Del. 1988). Thus, the court begins by determining Firebrand's standalone value as a going concern, based on the operative reality of the enterprise as of June 1, 2022. Firebrand was a holding company whose value principally derived from its ownership of EBCH and, in turn, EarlyBird. Therefore, the standalone valuation centers on the value of EarlyBird's operating business, its cash and securities portfolio, the effect of its regulatory capital requirements, and its subordinated debt. The court determines those components

before resolving the Share Dispute. It addresses the allocation of the resulting value separately.

## B. The Experts' Valuations

The parties' experts adopted different valuation frameworks and reached dramatically different conclusions. Petitioner's expert, Brett Margolin, used a capitalized cash flow analysis of EarlyBird's operating business and added cash and securities as separately valued assets. His analysis produced a range of per-share values depending principally on the value assigned to the securities portfolio and the treatment of the Disputed Shares. Petitioner asks the court to adopt the high end of that range, $18.50 per share.[96]

Respondents' expert, J.T. Atkins, valued Firebrand using an equity-level dividend discount model ("DDM") and a guideline public company analysis. His reports assigned weight to both methodologies and produced values ranging from approximately $7.00 to $7.29 per share.[97] Respondents ask the court to give no weight to the guideline company analysis and contend that Atkins's DDM supports a value of $6.79 per share.[98]

---

[96] Pet'r's Reply Br. 1, 3. Margolin's $18.50 per share figure assumed (i) an 81.5% allocation of EBCH's economic value and (ii) a $47.8 million valuation of the securities portfolio. Pet'r's Opening Br. 1, 6, 36–37, 63; Pet'r's Reply Br. 1, 3, 8, 31 n.142, 45.

[97] Resp'ts' Sur-Reply Br. 3; Post-Trial Arg. at 95:5−9.

[98] Resp'ts' Answering Br. 40; *see also* Post-Trial Arg. at 95:7−8.

Both experts normalized EarlyBird's performance using historical periods ending in FY2019, thereby excluding the extraordinary results generated during the subsequent SPAC boom. Their disagreements concerned the appropriate income approach, the treatment of cash and the securities portfolio, the amount of capital required to support EarlyBird's regulated business, and the treatment of the subordinated loan. Their competing approaches to the Share Dispute are addressed separately.

### 1. Margolin's analysis

Margolin valued EarlyBird's operating business using a single-period capitalization model and then added non-operating assets held on the consolidated balance sheet.[99] He did not perform a guideline company analysis, reasoning that EarlyBird's specialization in SPAC underwriting and the condition of the SPAC market as of the Merger Date undermined the usefulness of peer-company comparisons.[100]

Margolin used the five fiscal years ending in FY2019 (*i.e.*, FY2015−FY2019) as the normalized period, excluding the extraordinary results generated during the subsequent SPAC boom.[101] That period produced average annual revenue of

---

[99] Margolin Report ¶¶ 36, 41(A), 42.

[100] *Id.* ¶ 42.

[101] *Id.* ¶ 45; Tr. 332:7−8 (Margolin).

approximately $22.4 million and average annual EBITDA of approximately $4.9 million (an EBITDA margin of about 21.8%).[102] Because Margolin valued cash and the securities portfolio separately, he excluded interest on cash and realized and unrealized securities gains and losses from the operating results that formed the basis of his capitalization analysis. In his view, including those items in operating cash flow and then adding the underlying assets separately would distort the cash economics or double-count value.[103]

Margolin converted normalized EBITDA into annual free cash flow of approximately $3.8 million by applying a 22.41% effective tax rate, capital expenditures equal to 0.2% of revenue, and no working capital investment.[104] He estimated the cost of equity using the capital asset pricing model ("CAPM"). In doing so, he used: (i) the 20-year U.S. Treasury yield of 3.31% on June 1, 2022, as the risk-free rate; (ii) a 5.35% size premium (from Kroll's smallest revenue portfolio proxy); and (iii) a median cash-adjusted unlevered beta of 1.35 from guideline-company betas. Using those inputs, Margolin concluded that EarlyBird's cost of equity "does not exceed 17.08%."[105] Margolin paired that required return with a

---

[102] Margolin Report ¶ 47.

[103] *Id.* ¶¶ 46, 72; Tr. 254:7–256:1 (Margolin).

[104] Margolin Report ¶ 48.

[105] *Id.* ¶ 68.

23

3.0% long-term growth rate.[106]   Using those inputs, he capitalized the normalized

free cash flow and derived a present value of operating cash flows of $26,741,788

as of the Merger Date.[107]

Margolin then added the cash and securities excluded from his operating

model.   Relying on the May 31, 2022, financials, he identified approximately

$90.9 million in unrestricted cash and cash equivalents, and restricted cash of

approximately $500,000.[108]   Margolin did not independently value the securities

portfolio.   Instead, he used two alternative values drawn from the record:   a

$47.8 million value reflected on the May 31, 2022, consolidated balance sheet and a

$16.4 million value derived from the lower post-Merger Cassel materials.[109]

---

[106] *Id.* ¶ 69.

[107] *See id.* ¶ 70.

[108] *Id.* ¶ 73; JX 224 at 2.  Margolin opined that, in general, no discount should be applied to cash.  Pet'r's Opening Br. 41; Tr. 283:12–16 (Margolin).  Petitioner argues that "[i]t is undisputed that the Company has no wasting cash."  Pet'r's Opening Br. 41 n.197; *see also* Pet'r's Reply Br. 5–6.

[109] Margolin Report ¶¶ 27, 74; JX 148 at 20; JX 331 Tab "Summary" Cell X59; JX 316 Tab "Cons BS" Cell H13.  Margolin did not accept Cassel's post-closing revised valuation. In support of that position, Petitioner noted this court's preference for contemporaneous valuations and its healthy skepticism for post-merger adjustments.  Pet'r's Opening Br. 42– 43.  Petitioner further points to the FINRA Report as of June 30, 2022, which listed the value of EarlyBird's securities portfolio at $43.4 million.  *Id.* at 44–45 (citing JX 461 at 5). Petitioner argues that only after it was clear that he would not withdraw his appraisal demand did management begin considering revising the valuation and characterizing the outlook so negatively.  *Id.* at 45–46.

The experts diverged on whether EarlyBird's regulatory capital requirements limited the amount of cash and investments that could be treated as separately valued assets. Margolin did not exclude any regulatory capital from his valuation. Although he acknowledged that underwriting and regulatory capital requirements constrained the immediate availability of some cash and investments, he maintained that the constraints did not eliminate the assets' value and the cash should be included dollar-for-dollar in the equity valuation so long as it was not "wasting."[110]

Margolin next considered whether the $2.9 million related-party subordinated loan should be deducted from the value of EarlyBird. Although the loan remained a legal obligation, Margolin characterized the subordinated debt as historically treated as equity-like capital for certain purposes.[111] For that reason, Margolin presented valuation outputs both including and excluding a deduction for the subordinated debt.

Across his alternative portfolio and debt scenarios, Margolin's model produced combined EarlyBird- and EBCH-level values ranging from approximately $131.3 million to $165.7 million before adding $324,826 of cash held directly by

---

[110] *Id.* ¶¶ 75, 77; Tr. 318:21–320:12 (Margolin).

[111] Margolin Report ¶ 87; Tr. 261:18–262:2, 316:18–22, 369:17–19 (Margolin); *see also id.* at 424:14–23 (Carr) ("[T]he debt that is allowed to be included in regulatory capital has to meet various conditions, which makes it economically very similar to equity. It has to be unsecured. It has to be subordinated. FINRA has certain acceptable language as to that subordination. So on and so forth."); Pet'r's Opening Br. 49 n.245.

Firebrand. He then translated those values into per-share results under the parties' competing approaches to the Share Dispute.[112]

### 2. Atkins's analysis

Atkins's analysis centered on the premise that, as a regulated broker-dealer, EarlyBird should be valued at the equity level.[113] He reasoned that "debt and equity are actually part of the working capital of a financial institution," and that the firm should therefore be valued by reference to cash flows available to equity holders or distributable earnings.[114] Atkins first valued EBCH and then translated that value to Firebrand by accounting for the entities' cross-ownership.[115] He then added assets held directly by EBCH and applied a waterfall to determine the portion of EBCH's value economically attributable to the outside Firebrand stockholders.

Atkins's reports employed two methods: a DDM and a guideline public companies analysis using equity multiples, which he initially weighted equally.[116]

---

[112] Under Petitioner's proposed 81.5% allocation, Margolin's model produced per-share results ranging from $14.99 to $18.50. Under the 69.1% waterfall, the model produced results ranging from $12.71 to $15.69. Margolin Report ¶ 2.

[113] JX 394 ("Atkins Report") ¶ 50; JX 403 ("Atkins Rebuttal Report") ¶ 47.

[114] Tr. 446:17–448:7 (Atkins); Atkins Report ¶¶ 46–51.

[115] Atkins Report ¶¶ 74, 76–79.

[116] *Id.* ¶¶ 14, 47; Atkins Rebuttal Report ¶ 71(a); Tr. 446:17−448:15 (Atkins). Atkins employed the DDM "[b]ecause of the unique nature of financial service companies" given that they "are generally valued on cash flows to equity." Atkins Report ¶ 51. "[W]hen it comes to financial institutions, . . . the debt and equity are actually part of the working

26

The DDM capitalized normalized net income as a proxy for distributable earnings.[117] Atkins's opening report used FY2016 through FY2019 as the normalized period.[118] In rebuttal, he aligned his analysis with Margolin's FY2015 through FY2019 period.[119] Atkins's updated analysis began with approximately $83.6 million of EarlyBird cash, subtracted the approximately $44 million post-Merger dividend, and treated the remaining $39.6 million as cash retained for regulatory capital. Atkins included interest income on that retained cash, deducted interest expenses on the $2.9 million subordinated loan, and applied a 32.9% tax rate. That calculation produced updated normalized net income of approximately $2.9 million.[120] He also presented an adjusted case of approximately $2.6 million after accounting for $500,000 of anticipated annual costs associated with the SEC's proposed SPAC rules.[121]

capital of a financial institution." Tr. 447:3−8 (Atkins). "Under a DDM analysis, the value of the stock of the financial services company is the present value of expected dividends on that stock." Atkins Report ¶ 51. The DDM "look[s] . . . at the equity value. [] DDM is an equity-driven analysis, equity-driven calculation. And that's why we also look at price to earnings and price to book, because those are also equity measures of valuation." Tr. 448:3−7 (Atkins).

[117] Atkins Report ¶¶ 51–53.

[118] *Id.* ¶ 55.

[119] Atkins Rebuttal Report ¶¶ 21, 57, 59, 66; *id.* at 59.

[120] *Id.* ¶ 66; *id.* at 59.

[121] *Id.* ¶¶ 63–64; *see id.* at 59.

Atkins applied a 14.3% cost of equity and a 2.0% perpetual growth rate in his baseline DDM, while also presenting sensitivities using a 3.0% growth rate.[122]  In his CAPM framework, he used a risk-free rate based on the 20-year U.S. Treasury yield as of June 1, 2022 (*i.e.*, 3.31%), along with a supply-side equity risk premium of 6.22% and a size premium of 4.80% from Kroll Cost of Capital for 2022.[123]  He used a levered beta of 1.00, which he described as "[r]epresent[ing] a stable growth beta."[124]

Atkins's treatment of the balance sheet differed materially from Margolin's. He identified approximately $83.6 million of unrestricted cash at EarlyBird and approximately $14.3 million of investments at EarlyBird, consisting of approximately $8.3 million of SPAC securities and $6.1 million of other securities.[125]  He also deducted the $2.9 million related-party subordinated loan.[126]

---

[122] *Id.* ¶¶ 56–57; *id.* at 84; Atkins Rebuttal Report ¶¶ 5(h), 48, 50, 67.  Atkins calculated the cost of equity as Risk Free Rate + (Levered Beta x Total Equity Risk Premium) + Size Premium.  *See* Atkins Report at 84 n.6.

[123] Atkins Report ¶ 56 nn.91–92; *id.* at 84 & nn.1–6.  Atkins explained that "EarlyBird falls under the 10th size premium decile with equity market capitalization ranging from $10.6 million to $289.0 million."  *Id.* ¶ 56.

[124] *Id.* ¶ 56 (citing Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* 588 (3d ed. 2012) ("*Investment Valuation*"); *id.* at 84.

[125] *Id.* at 69.

[126] *Id*. ¶¶ 43–45; *id.* at 69.

At the EBCH level, Atkins identified approximately $7 million of cash and $2.9 million of SPAC securities.[127]

Respondents' later briefing reframed the treatment of EarlyBird's nonmarketable SPAC holdings. They contended that those securities were better understood as securities-based compensation that should be reflected through the income statement and, only in the alternative, through a rights-data approach if the court deemed a separate balance sheet valuation necessary.[128]

Atkins identified "excess cash" as the portion of cash that was, in fact, distributed in a post-Merger dividend—$43,996,303—and added that amount in the bridge from the DDM-implied operating equity value to an implied EarlyBird equity value.[129] He treated the remaining cash as capital retained to support EarlyBird's underwriting business and regulatory obligations. In his rebuttal analysis, the contribution of that retained cash was reflected through the interest income included in normalized net income rather than through a dollar-for-dollar addition to the balance sheet.

Atkins relied in part on the regulatory capital analysis of Respondents' expert, Emre Carr. Carr opined that it was "economically *reasonable* for a broker-dealer to

---

[127] *Id.* ¶ 44; *id.* at 69; Atkins Rebuttal Report ¶ 68.

[128] Resp'ts' Answering Br. 6, 33, 43–45, 55; Resp'ts' Sur-Reply Br. 2–3, 21–35.

[129] *See* Atkins Rebuttal Report ¶¶ 31, 62, 68; *id.* at 59–63.

maintain a level of capital that is continuous and that addresses its anticipated IPO activity because doing so lessens operational costs and risks."[130] Carr further explained that "[i]t is *reasonable* for broker-dealers like EarlyBird to maintain net capital in the form of equity based on a range of expected IPO sizes . . . and to borrow subordinated debt only when necessary."[131] Based on his review of historical IPO data, Carr estimated that "it is reasonable to assume that the average size of EarlyBird's participated amounts in IPOs going forward, as expected as of the Merger Date, would be at least $100 million, in a range of $100 million to $150 million, with the largest IPO opportunities exceeding $200 million."[132] Carr calculated that EarlyBird's required regulatory net capital amounts ranged between $29 million and $44 million.[133]

Atkins also performed a comparable companies analysis using three publicly traded broker-dealers that operated, to some degree, in the SPAC market with capitalization of less than $1 billion—Cowen, Inc., Oppenheimer Holdings, Inc., and

---

[130] Carr Report ¶ 17(b) (emphasis added).

[131] *Id.* ¶ 17(e) (emphasis added); *see also id.* ¶ 17(d) ("A broker-dealer also can use subordinated loans as capital, but such loans can be costly, must be approved by FINRA, and can be used only a limited number of times per year if they are very short-term borrowings. Thus, they generally do not constitute a reasonable source of regulatory net capital for frequent needs.").

[132] *Id.* ¶ 64; *see also id.* ¶¶ 62, 73.

[133] *Id.* ¶ 74.

Cohen & Company Inc.—as comparables.[134] After applying price-to-book and price-to-earnings multiples and adding the amount treated as excess cash, that analysis produced an EarlyBird implied equity range of approximately $63.1 million to $69.5 million.[135] Adding the approximately $9.9 million of cash and securities held directly by EBCH produced an implied EBCH equity range of approximately $73.0 million to $79.4 million.[136]

In rebuttal, Atkins reported weighted equity values ranging from approximately $75.8 million to $77.7 million, depending on the normalized earnings and perpetual-growth assumptions used. He then translated those values into per-share results through the 69.1% waterfall.[137] Respondents ultimately ask the court to rely on the DDM alone and to use the guideline-company analysis only as a cross-check.[138]

---

[134] *Id.* ¶ 63.

[135] *Id.* ¶ 14(c), at 65.

[136] *Id.* ¶¶ 62–70; *id.* at 65, 68. The approximate EBCH range reflects the addition of approximately $7 million of EBCH cash and $2.9 million of EBCH securities to the EarlyBird range. *See id.* at 65.

[137] Atkins's rebuttal analyses produced per-share results ranging from approximately $7.10 to $7.29; his opening analysis also produced a $7.00 sensitivity result. *See* Atkins Rebuttal Report ¶ 71. Respondents' final position is that the DDM alone supports $6.79 per share. *Id.* ¶¶ 5(g), 72; Resp'ts' Answering Br. 40; Post-Trial Arg. at 46:21–47:3.

[138] At the conclusion of trial, the court requested that the parties submit a chart identifying their points of agreement and disagreement concerning valuation inputs and methodologies. The parties were unable to agree on a single version and instead submitted separate versions. Resp'ts' Answering Br. App. 2 at 2. *Compare* Pet'r's Opening Br. App. 2, *with* Resp'ts' Answering Br. App. 2.

## C.    The Court's Valuation

The experts' principal areas of disagreement concern the appropriate valuation methodology, the treatment of cash and regulatory capital, the value of the securities portfolio, the effect of anticipated regulatory changes, and the allocation of value through Firebrand's and EBCH's circular ownership structure.

These disputes are interrelated.  The treatment of cash cannot be separated from the role that capital played in EarlyBird's operative reality as a regulated broker-dealer.[139]  Nor can the court determine whether investments should be valued separately without first deciding whether the selected methodology already captures their economic contribution.  The court therefore begins by identifying the valuation framework that best fits EarlyBird's business and evidentiary record, and then addresses the principal disputed inputs within that framework.

The court concludes that Margolin's income-based approach provides the better starting point, but only after adjustment.  Atkins is correct that EarlyBird cannot be valued as though all of the capital on its balance sheet necessary to support its underwriting business were wholly distributable without consequence to the going concern.  But Margolin is correct that substantial balance sheet assets do not

---

[139] Carr Report ¶¶ 17(b), 17(e), 74; Tr. 404:23–405:7, 413:8–14, 424:14–425:12 (Carr); Aswath Damodaran, *Valuing Financial Services Firms*, 1 J. Fin. Persps. 1 (Mar. 2013) ("*Valuing Financial Services Firms*"), at 3–5, 7 (explaining that financial firms are subject to regulatory-capital constraints and are often better valued at the equity level because debt and reinvestment are harder to define).

lose their value merely because they serve a regulatory or operational function. The court therefore adopts Margolin's capitalization approach as the basic framework because it more transparently separates the value of the operating business from the value of discrete balance sheet assets. The court then adjusts that framework to account for the portion of cash reasonably required to support operations, values the securities portfolio more precisely than either expert proposed, rejects speculative expense adjustments tied to future regulatory developments, and resolves the Share Dispute after determining the EBCH-level value.[140]

### 1. Operating value

The record does not support a traditional multi-period discounted cash flow model. No reliable management projections existed as of the Merger Date, and both

---

[140] The court assigns no independent weight to Atkins's comparable company analysis. Respondents did not persuade the court that the three companies that Atkins selected as comparables were sufficient to support his analysis. *See* James R. Hitchner, *Financial Valuation: Applications and Models* (5th ed. 2025) (ebook) ("Comparability relates to similar operating characteristics; therefore, companies within the same industry are not always comparable to the subject company."). Glen A. Larsen Jr., Frank J. Fabozzi & Chris Gowlland, *Relative Valuation Methods for Equity Analysis*, in 2 Encyclopedia of Financial Models 33, 34 (F.J. Fabozzi ed., 2013) ("[S]ometimes there can be considerable difficulties in identifying 'similar' companies, particularly if the firms under consideration are unusually idiosyncratic in terms of their product mix, geographical focus, or market position."); *id.* at 35 ("[I]t is desirable to have at least five or six comparable companies, in order to begin drawing conclusions about relative valuation for a particular industry."); *id.* ("[I]f the sample is too small, then the idiosyncrasies of individual firms may exert an excessive influence on the average multiple, even if the analyst focuses on the median rather than the mean when calculating the 'average' multiple."). Beyond that, the Respondents retreated from that analysis, pointing to it as merely a cross-check rather than as an independent component of value. Resp'ts' Answering Br. 55–57; Resp'ts' Sur-Reply Br. 40–41; Post-Trial Arg. at 51:21–52:2, 52:11–16, 53:6–8.

experts relied on historical performance to normalize. In that setting, the court finds a capitalization approach more persuasive than Atkins's dividend discount model.[141]

Atkins rightly observed that financial institutions are often valued at the equity level and that debt and equity play a different role in the capital structure of a broker-dealer than in an ordinary industrial company.[142] Damodaran's guidance, which Respondents invoked, recognizes that financial firms operate under regulatory capital constraints and are often better valued directly at the equity level because debt and reinvestment are harder to define in the ordinary corporate finance sense.[143]

---

[141] Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 36 (5th ed. 2014) ("*Cost of Capital*") ("In *capitalizing*, instead of projecting all future economic income to the respective class(es) of capital, *we focus on the economic income of just one single period, usually the normalized economic income expected in the year immediately following the valuation date*.") (emphasis in original); *see also Laidler v. Hesco Bastion Env't., Inc.*, 2014 WL 1877536, at *8 (Del. Ch. May 12, 2014) ("Though DCF is more prominently employed in Delaware appraisal litigation, both parties' experts opine that employing a DCF is not feasible here because [the Company's] management never made cash flow projections in the ordinary course of its business. I assume, therefore, that use of the [direct capitalization of cash flow] analysis is the appropriate method for determining the present value of the Company based on income."); *see also Cost of Capital* at 37 ("[T]he process of capitalizing is really just a shorthand form of discounting.").

[142] *See* Atkins Report ¶ 50; Tr. 446:17–448:7 (Atkins).

[143] *See Valuing Financial Services Firms* at 3–10 (explaining that, for financial service firms, debt is more akin to raw material than capital, reinvestment is difficult to define, and regulatory capital constraints affect valuation).

But the strength of a dividend discount model lies in its ability to capitalize a reasonably stable stream of expected distributable earnings.[144]  Here, EarlyBird operated in a highly concentrated and highly volatile corner of the capital markets.[145] As Nussbaum acknowledged, Firebrand generated virtually all of its revenue from EarlyBird's SPAC-related business.[146]  The SPAC market boomed and then deteriorated sharply.[147]  Atkins's model depended on several interrelated assumptions about normalized net income, a stable payout ratio, a stable return on equity, and long-term stability that the record does not persuasively support. Petitioner also fairly points out that Atkins's DDM capitalizes normalized net

---

[144] Atkins Report ¶¶ 51–53; *see Investment Valuation* at 13 ("The dividend discount model is a special case of equity valuation, where the value of equity is the present value of expected future dividends.").

[145] The SPAC market showed significant concentration in several key areas.  "P[rivate] E[quity] firms and hedge funds are central players in the SPAC market, both as sellers of companies and as sponsors of their own SPAC vehicles."  Joshua Rosenbaum & Joshua Pearl, *Investment Banking:  Valuation, LBOs, M&A, and IPOs* (3d ed. 2020) (ebook).  The investor base also demonstrated concentration patterns.  "The investors represented a relatively limited community, and as the SPACs got larger and, some would say, greed set in, there simply were not enough investors to go around."  David N. Feldman, *Regulation A+ and Other Alternatives to a Traditional IPO:  Financing Your Growth Business Following the JOBS Act* 113 (2018).  SPAC sponsors also tended to be concentrated among specific types of professionals.  "SPAC sponsors tend to be corporate executives, professional investors, PE firms, or hedge funds with successful M&A and investing track records."  Rosenbaum & Pearl, *Investment Banking*.

[146] PTO ¶ 46; Nussbaum Dep. 86:11 (EarlyBird is "a one trick pony; SPACs are us.").

[147] *See* Michael Klausner & Michael Ohlrogge, *Was the SPAC Crash Predictable?*, 40 Yale J. Reg. 101, 102 (2023) ("[T]he number of SPAC IPOs and SPAC mergers skyrocketed in 2020 and 2021.  . . . By the beginning of 2022, however, the SPAC crash had begun. . . . News reports in 2022 confirmed that SPACs had lost their luster and were no longer viewed as the miraculous financial innovation that some had imagined." (footnotes omitted)).

income as a proxy for distributable earnings rather than the normalized operating cash flow stream captured by Margolin's approach.[148]

Margolin's model is imperfect, but it better fits the evidentiary record and aids the court's analysis. It begins with normalized operating performance, values the operating business through a transparent capitalization analysis, and then separately values cash and investments. That structure allows the court to decide directly which assets are embedded in the going concern value and which must be added separately. The court therefore adopts Margolin's single-period capitalization approach as the foundation for valuing EarlyBird's operating business, subject to the adjustments discussed below.

The normalization period should exclude the distorted "SPAC frenzy" years and focus on pre-frenzy historical operations.[149] Both experts ultimately adopted

---

[148] Pet'r's Reply Br. 26–29; *see Cost of Capital* at 27–28 ("It is incorrect to focus on earnings as the cash flow stream to be valued because earnings contain a number of accounting adjustments and already include the impact of capital structure.") (quoting Morningstar, Inc., *Ibbotson SBBI Valuation Yearbook 2013: Market Results for Stocks, Bonds, Bills, and Inflation 1926-2012 (Stocks, Bonds, Bills, and Inflation (SBBI) Yearbook (Valuation Edition))* 14 (2013)).

[149] *See* National Association of Certified Valuators and Analysts, *Business Valuation: Fundamentals, Techniques, and Theory* (2026) (ebook) ("The analyst should consider any macroeconomic events or industry-wide trends that may have influenced the financial performance of the companies involved in the comparable transactions. These external factors can affect the comparability of the data over different time periods if they do not influence the subject company's financial performance. This may inform the analyst about the number of years of financial statements needed, whether specific periods should be

that approach.[150]  The court therefore finds it appropriate to use the pre-frenzy

historical window as the basis for estimating sustainable operating performance.

EarlyBird's business was plainly capable of generating meaningful fee income.  A

SPAC is, in essence, an alternative IPO mechanism by which a public shell raises

funds, places them in trust, and seeks to merge with an operating business within a

specified period.[151]  The underwriter's compensation reflects that structure,

including front-end and deferred fees and, often, compensation in securities.[152]  But

the extraordinary conditions of the SPAC boom were not sustainable.  The court

therefore declines to capitalize frenzy-era economics as though they represented

ordinary course operations.

Although the court adopts Margolin's capitalization framework as the better

starting point, it does not accept all of Margolin's capitalization inputs unchanged.

Acknowledging that the experts' differences on certain inputs had only a modest

effect on per-share value, the court concludes that the record supports using Atkins's

---

adjusted or excluded, and whether to ask additional questions or request documentation regarding the subject company's financial operations.  Placing the subject company and its historical financial performance in context ensures an apples-to-apples comparison when applying market multiples.").

[150] Margolin Report ¶ 45; Atkins Report ¶ 57; Tr. 331:7–8 (Margolin).

[151] PTO ¶¶ 67–68.

[152] Margolin Report ¶ 14; Atkins Report ¶ 33.

tax rate and perpetual growth rate and using Atkins's CAPM inputs except for beta. Those modifications better reflect EarlyBird's operative reality.[153]

### a. Tax rate

The court adopts Atkins's tax rate of 32.9%. Atkins used the actual effective tax rate applicable to EarlyBird as of the Merger Date (*i.e.*, for FY2022), combining the applicable federal corporate income-tax rate with the state and local taxes the company was in fact paying.[154] Respondents emphasized that this rate reflected the consolidated entities' operative reality as of the Merger Date, and that approach is consistent with the principle articulated in *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd*, 177 A.3d 1, 38 (Del. 2017).[155] By contrast, Margolin did not use EarlyBird's actual tax rate. Instead, he used an industry-standard tax rate of 22.41%, which he acknowledged excluded New York City local taxes.[156] As the Delaware Supreme Court indicated in *Dell*, "[t]here is precedent favoring adopting tax rates consistent with the operative reality of the company under consideration." 177 A.3d at 38; *see also In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *48 n.49 (Del. Ch. May 31, 2016) (collecting cases), *aff'd in part, rev'd in part sub nom.*,

---

[153] *See* Atkins Report ¶¶ 56–57; Atkins Rebuttal Report ¶¶ 48, 50, 57, 63–64; Pet'r's Reply Br. 31–32 (quantifying the offsetting effects of the tax rate, cost of equity, and perpetual growth rate changes).

[154] Tr. 460:21–461:11 (Atkins).

[155] Atkins Report at 66 n.3; Resp'ts' Answering Br. 35–36.

[156] *See* Margolin Report ¶ 48; Tr. 355:19–356:13 (Margolin).

*Dell*, 177 A.3d. In particular, that is true when "the evidence supports the . . . [assumption] that this operative reality was likely to continue." *Dell*, 177 A.3d at 38. That is the case here. The consolidated entities' effective tax rate of 32.9% was the FY2022 rate, the year the Merger became effective. The actual effective tax rate better reflects the operative reality and is therefore the more persuasive input. The court therefore uses a 32.9% tax rate in its valuation.

### b. Cost of equity

To calculate the cost of equity, the experts for both Petitioner and Respondents used CAPM, which can be expressed as:

$$K_E = R_F + (\beta \times R_{ERP}) + R_{ESP}$$

Where $K_E$ = Cost of equity

$R_F$ = Risk-free rate

$\beta$ = Beta

$R_{ERP}$ = Equity risk premium

$R_{ESP}$ = Equity size premium

"In simpler terms, the cost of equity equals the risk-free rate plus an equity size premium plus the company's beta times the market risk premium." *Merion Cap., L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *14 (Del. Ch. July 8, 2013). "Under the CAPM, the equity risk premium is not used in isolation to estimate the subject company's cost of capital. Rather, the equity risk premium is adjusted by an estimate

of the systematic risk of the subject company reflected by its actual or estimated beta." *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 340 (Del. Ch. 2006).

The court does not adopt either expert's cost of equity wholesale. Instead, consistent with the court's modified use of Margolin's capitalization framework, the court adopts a blended set of CAPM inputs. Specifically, the court adopts Atkins's risk-free rate, equity risk premium, and size premium, but uses a beta of 1.35. Those inputs yield a cost of equity of 16.51%.

As the court has previously articulated,

> The cost of equity is typically calculated through the capital asset pricing model ("CAPM"). The CAPM is a generally accepted method of determining a company's cost of equity by reference to the risk-free rate of return, the market risk premium, and the differential between investment in a particular industry or company and investment in a diversified portfolio of stocks. Essentially, the CAPM estimates the expected return of an investment based on its riskiness relative to the rest of the market. It achieves this by adding to the risk-free rate the risk premium associated with investing in a diversified portfolio of stocks modified by a particular stock's riskiness relative to the rest of the market (*i.e.*, beta).

*Ramcell, Inc. v. Alltel Corp.*, 2022 WL 16549259, at *19 (Del. Ch. Oct. 31, 2022) (citation modified).

### i.    Risk-free rate

"The CAPM model typically derives the risk-free rate from government treasury obligations. Treasury bills are typically considered nearly free of default

risk because they are backed by the full faith and credit of the United States government." *Id.* (citation modified). "In the appraisal context, this Court has used the 20-year Treasury bond yield on numerous occasions in its calculation of the risk-free rate." *Merion*, 2013 WL 3793896, at *15 & n.128 (collecting cases). The parties agree that the appropriate risk-free rate is the 20-year U.S. Treasury rate as of June 1, 2022, which was 3.31%.[157] The court adopts that figure.

### ii.    Beta

"As a matter of valuation theory, 'companies that are more unstable and leveraged, less established and financially and competitively secure, and in colloquial terms "riskier," should have higher betas.'" *Merion*, 2013 WL 3793896, at *16 (quoting *Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 521 (Del. Ch. 2010)). "A beta of 1 means that the asset or a portfolio has the same quantity of risk as the market portfolio. A beta greater than 1 means that the asset or portfolio has more market risk than the market portfolio." Frank J. Fabozzi & Pamela Peterson Drake, *Finance:    Capital Markets, Financial Management, and Investment Management* (2009) (ebook).

The principal dispute concerns whether the court should use Margolin's beta estimate of 1.35 or Atkins's beta of 1.00. The answer depends on the cash flow being capitalized. The court is not adopting Atkins's equity-level model, under

---

[157] Post-Trial Arg. at 63:1–2.

which substantial cash and regulatory capital remained embedded in the firm, thereby helping lower overall equity risk. Nor is the court adopting Margolin's model in full. Rather, the court is using a modified version of Margolin's single-period capitalization approach to value EarlyBird's operating business, while separately accounting for cash and securities, subject to discounts reflecting regulatory constraints, limited distributability, and portfolio-specific risks. Although Margolin described 1.35 as derived from a cash-adjusted peer analysis, the court uses that figure as a reasonable proxy for the systematic risk of the operating business, which capitalizes its cash flows in the modified framework.

In that framework, a higher beta is more appropriate. Because the court separately addresses the value of cash and securities, Atkins's lower beta of 1.00 would import into the discount rate a risk measure tempered by assets the court has already treated outside the capitalized operating stream. By contrast, Margolin's beta estimate of 1.35 better fits the modified capitalization framework that the court adopts here. Therefore, the court adopts a beta of 1.35.

### iii.    Equity risk premium

"The equity risk premium is the incremental return (premium) that investors require for holding equities rather than a risk-free asset. Thus, it is the difference between the required return on equities and a specified expected risk-free rate of

return."[158]  The experts do not disagree over what equity risk premium to use.  Both relied on a supply-side equity risk premium of 6.22% as published in Kroll Cost of Capital Navigator for 2022.[159]  Therefore, the court adopts the 6.22% Kroll supply-side equity risk premium.

### iv.    Size premium

"A size premium may be added when determining the cost of equity for a smaller company to account for the higher rate of return demanded by investors to compensate for the greater risk associated with small company equity."  *Ramcell*, 2022 WL 16549259, at *20 (citation modified).  Margolin selected a size premium of 5.35% based on Kroll's smallest revenue portfolio.[160]  He testified that there is empirical evidence supporting the inference that the size premium not only no longer exists but also never existed.[161]  On that note, Atkins argued that "small companies always need size premiums."[162]  Atkins selected a size premium of 4.8% based on the standard Kroll decile framework, which avoids the additional complexity

---

[158] Jerald E. Pinto et al., *Equity Asset Valuation* (2d ed. 2010) (ebook).

[159] Margolin Report at 65; Atkins Report 84 n.2.  Margolin also presented an implied risk premium alternative but continued to use the conventional Kroll supply-side premium because no consensus had developed around the alternative approach.  Margolin Report ¶ 59 (citing Aswath Damodaran, *Equity Risk Premiums (ERP): Determinants, Estimation, and Implications - The 2022 Edition* (Mar. 2022)).

[160] Margolin Report ¶ 62.

[161] Tr. 252:10–16 (Margolin); Margolin Report ¶ 60.

[162] Tr. 451:16–17 (Atkins).

associated with Margolin's revenue-based selection. Atkins justified using a market capitalization-based approach as more consistent with Delaware appraisal practice.[163] The court agrees with Atkins and adopts a size premium of 4.8%.

### c. Perpetual growth rate

The court adopts Atkins's 2.0% perpetual growth rate. Atkins explained that a 2.0% stable-growth assumption was appropriate because a higher perpetuity growth rate would require corresponding reinvestment.[164] Atkins criticized Margolin's 3.0% growth assumption as being unsupported because it paired a higher growth rate with no meaningful reinvestment assumption.[165] The court agrees. Given the court's use of a stable, pre-frenzy historical period, the volatility of EarlyBird's SPAC-focused business, and the regulatory and market headwinds present as of the Merger Date, a 2.0% perpetual growth rate better reflects a mature, stable-growth state than Margolin's 3.0% figure. Petitioner's own submission indicates that the difference between the two figures has only a modest effect on per-share value, which further supports adopting the more conservative and better-supported input. The court therefore uses a 2.0% perpetual growth rate.

---

[163] *Id.* at 451:22–452:3.

[164] *Id.* at 464:11–18; *see also Investment Valuation* at 383 ("[T]he reinvestment rate used to estimate free cash flows to the firm should be consistent with the stable growth rate.").

[165] Tr. 465:5–9 (Atkins).

Applying the court's selected inputs to Margolin's normalized operating framework results in a present value of operating cash flows of $22,441,012.87.

## 2. Cash and regulatory capital

Much of the parties' disputes focused on the treatment of cash and other liquid, allowable assets on EarlyBird's balance sheet. Petitioner argues that Respondents improperly assign "zero value to $40 million of cash" by labeling it regulatory capital.[166] Respondents argue that Petitioner's model gives stakeholders the benefit of both future underwriting cash flows and the full value of the capital necessary to generate those cash flows.[167] Both sides overstate the implications of the authorities on which they rely.

Petitioner invokes *Ramcell* for the proposition that, "[w]hen calculating free cash flow ('FCF'), cash should not be included as a current asset for the purposes of calculating working capital because cash is considered a non-operating asset."[168] 2022 WL 16549259, at *16 n.199 (citation modified). But that proposition does not resolve the dispute. *Ramcell* did not involve a regulated broker-dealer whose business required it to maintain capital to support underwriting commitments. The issue here is not whether cash is always non-operating in the abstract. It is how to

---

[166] Pet'r's Opening Br. 41, 54–55, 60–61; *see* Pet'r's Reply Br. 4–9.

[167] Resp'ts' Sur-Reply Br. 12.

[168] Pet'r's Opening Br. 38–39.

treat cash and other liquid, allowable assets held by a firm whose ability to conduct its business depended in part on satisfying the Net Capital Rule. In broker-dealer financial statements, cash is generally considered an operating asset, unlike in most other industries, where excess cash is typically classified as non-operating.[169]

Petitioner also relies on *Gonsalves v. Straight Arrow Publishers, Inc.*, 2002 WL 31057465, at *7 (Del. Ch. Sep. 10, 2002), where this court disagreed with the "characterization of 'established Delaware law' as requiring that only excess cash be added to enterprise value in an appraisal valuation." Petitioner further relies on *Merion*, where the court treated cash separately from operating assets, both in estimating the risk of the operating business and in moving from operating value to equity value. 2013 WL 3793896, at *17, *23. Both cases are helpful to Petitioner's contention that cash does not become valueless merely because it is held for use in

---

[169] *See* Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance* 336–37 (2d ed. 2006); *see also Investment Valuation* at 423–24 ("If a firm needs cash for its operations—an operating cash balance—and this cash does not earn a fair market return you should consider such cash part of working capital requirements rather than as a source of additional value. Any cash and near-cash investments that exceed the operating cash requirements can be then viewed as non-operating assets and added to the value of operating assets. How much cash does a firm need for its operations? The answer depends on both the firm and the economy in which the firm operates."). In typical corporate valuations, "cash and near-cash investments—investments in riskless or very low-risk investments that most companies with large cash balances make" are treated as non-operating assets because "cash is not considered an operating asset; it is not an asset that will be generating future income for the business." *Investment Valuation* at 423; Paul Pignataro, *Financial Modeling and Valuation: A Practical Guide to Investment Banking and Private Equity* (2013) (ebook).

the business.  But neither involved a regulated broker-dealer whose going concern operations depended on maintaining qualified regulatory capital to support underwriting commitments.

Respondents rely instead on two appraisal cases encountering the issue of how to treat regulatory capital:  *In re PNB Holding Co. Shareholders Litigation*, 2006 WL 2403999 (Del. Ch. Aug. 18, 2006) and *In re Appraisal of SWS Group, Inc.*, 2017 WL 2334852 (Del. Ch. May 30, 2017), *aff'd sub nom.*, *Merlin Partners, LP v. SWS Group, Inc.*, 181 A.3d 153 (Del. 2018) (ORDER).  Respondents argue that, consistent with these two cases, "the [c]ourt should value [Firebrand] without distributing its regulatory cash reserve."[170]  According to Respondents, "future cashflows [] are generated only through EarlyBird's maintaining a regulatory-capital cash reserve."[171]  Respondents thus contend that "Petitioner—and Margolin—put forth a valuation that defies EarlyBird's operative reality, by giving Petitioner both the full benefit of future cashflows and the full value of EarlyBird's regulatory-capital cash reserves (required to facilitate those perpetual underwriting revenues). Petitioner and Margolin cannot have it both ways."[172]  Those decisions are closer, but they do not go as far as Respondents suggest.

---

[170] Resp'ts' Answering Br. 22.

[171] Resp'ts' Sur-Reply Br. 11.

[172] *Id*. at 12 (citation modified).

In *PNB*, this court confronted the appraisal of a bank holding company that had emerged from regulatory distress and, by the merger date, had become "exceptionally well-capitalized." 2006 WL 2403999, at *3, *26–27. The petitioners' expert, employing a discounted cash flow ("DCF") analysis, assumed a one-time distribution that would have reduced the bank's Tier-1 risk-based capital ratio (the "Tier-1 Ratio") from 15.3% to 6.29%, just above the 6% threshold for remaining well-capitalized. *Id.* at *26–27. This court rejected that assumption because it treated excess capital as though it could be reduced to the minimum without affecting the institution's operations or dividend policy. *Id.* at *27. But the court did not accept the opposite premise either. It rejected the assumption that the bank would simply continue to retain capital far above what prudence required. *Id.* Instead, *PNB* performed a more calibrated exercise. The court selected an intermediate Tier-1 Ratio of 8.5% and used that as an input into its DCF analysis. *Id.*

The court in *SWS* confronted that concept in the context of excess regulatory capital at a bank holding company with two general business segments: traditional banking and brokerage services. 2017 WL 2334852, at *2. This court performed its own DCF analysis and considered whether regulatory capital should be treated as value already embedded in the company's projected cash flows or instead added separately as excess cash. It rejected the petitioners' assumption that the company

48

could "*distribute* to shareholders *over half* of its pre-merger capitalization . . . with no effect on the [c]ompany or its income." *Id.* at *14 (emphasis in original). It also questioned the respondent's assumption that no distribution of excess regulatory capital was appropriate in light of changed circumstances. *Id.* Ultimately, the court relied on "management projections . . . [that] declined to assume a bulk distribution in projecting the [c]ompany's cash flows." *Id.* at *15. The court further found it "facially unreasonable to assume, as [the petitioners' expert did], that such a distribution could be made without effect on the [c]ompany's ability to generate cash flow consistent with its projections." *Id.* The court went on to question whether "in light of [the company's] recent emergence from major regulatory intervention, and its continuing business line in a highly regulated industry, that such a massive distribution would be possible from a regulatory p[er]spective." *Id.* & n.223 (citing trial testimony by a fact witness). The court accepted "as a matter of valuation methodology that non-operating assets—including cash in excess of that needed to fund the operations of the entity—are to be added to a DCF analysis." *Id.* But the court also noted that the petitioners were "conflat[ing] distributable cash or assets with a balance sheet increase in regulatory capital" and explained that the court in *PNB* "rejected a lump-sum distribution as proposed by [the petitioners' expert] valuation." *Id.* In discussing *PNB*, this court in *SWS* "explained that there was 'no basis in equity' to add to the DCF calculation a one-time dividend of excess

regulatory capital." *Id.* For those reasons, this court "defer[red] to management projections," which did not "envisage any such bulk distributions." *Id.* at *14–15.[173]

These cases are instructive, although not controlling in precisely the way Respondents suggest. They stand for the proposition that a valuation may not treat capital necessary to sustain the business as though it could be distributed without consequence, while simultaneously capitalizing the earnings generated by that capital. If the capital is necessary to support the business and is already reflected in the going concern value, it cannot also be added as though it were wholly non-operating. By the same token, if the balance sheet reflects value beyond what the business reasonably requires, that excess value does not disappear merely because the company is regulated.[174]

---

[173] The *SWS* petitioners relied on the appraisal decision in *Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *13–15 (Del. Ch. Nov. 24, 2004), *aff'd*, 875 A.2d 632 (Del. 2005). *SWS*, 2017 WL 2334852, at *14 n.211. In *Gholl,* this court explained that "cash [required] to fund ongoing operations . . . is reflected in a DCF valuation just as any operating asset is," whereas "any cash in excess of that necessary to fund the ongoing operations of the business is considered 'excess cash' and is not reflected in a DCF." *Gholl*, 2004 WL 2847865, at *13. The court rejected both the petitioners' contention that all cash was excess and the respondent's unsupported assertion that it needed between 28% and 41% of its cash to operate. *Id.* at *14. As a consequence of this methodological approach, this court articulated that "in determining the fair value of a corporation, excess cash must be added to the result of the DCF valuation." This court concluded that only about eight percent of cash was needed for working capital, based on an analysis by one of the company's directors and the prospective owner. *Id.* at *15.

[174] *See Investment Valuation*, at 422–23.

That principle is applicable here. Carr opined that, based on EarlyBird's historical IPO activity, the company would reasonably need between $29 million and $44 million of regulatory capital to support offerings in the $100 million to $150 million range.[175] The court credits Carr's general framework. He persuasively explained the operation of the Net Capital Rule, the haircut treatment of firm-commitment underwriting obligations, and the practical reason a broker-dealer would maintain capital sufficient to pursue anticipated deals without repeatedly struggling to raise funds. But the court does not accept the upper end of Carr's range as a continuous operating requirement.

The court does not adopt the upper bound of the range because the Net Capital Rule did not require EarlyBird to hold peak capital at all times. As Carr acknowledged, the formula remains constant, but the required amount varies with the firm's activity. The record reflects that the heightened capital requirement attached when underwriting commitments became effective or irrevocable and persisted only through the relevant offering period. Those capital needs were episodic, not constant. The record also shows that EarlyBird would satisfy its regulatory obligations through multiple sources. Although cash was often the preferred means—because it is fully allowable and other assets are subject to

---

[175] Carr Report ¶¶ 17(g), 74; Resp'ts' Sur-Reply Br. 18.

haircuts—the company could also rely on allowable assets and short-term subordinated debt, even if those alternatives carried cost and regulatory implications. Cash counts dollar-for-dollar toward qualified net capital; freely tradable securities count only after haircuts; and nonmarketable securities do not count because they receive a 100% haircut.

Most telling is EarlyBird's actual capital position. As of May 31, 2022, EarlyBird reported less than $1 million of required net capital and more than $71 million of excess net capital.[176] That figure does not equate to distributable value, but it does strongly suggest that the company's balance sheet resources materially exceeded the capital actually needed to keep the business running.

EarlyBird reasonably needed a meaningful but bounded amount of qualified regulatory capital to support its underwriting business. The court concludes that approximately $30 million best reflects that need as of the Merger Date. That figure falls within Carr's range, accounts for the episodic nature of peak capital requirements, and aligns with the company's historical practice of maintaining a consistent level of liquidity to support underwritings.[177] This reserve determination applies only to EarlyBird-level liquid, allowable assets that could support qualified net capital as of the Merger Date. Because cash counts dollar-for-dollar toward net

---

[176] JX 224 at 5 Nos. 11, 14.

[177] Carr Report ¶ 17(g); Tr. 99:6−10 (Nussbaum).

capital and EarlyBird held sufficient cash to satisfy the court's chosen $30 million reserve, the court deems that reserve satisfied first from cash rather than from the marketable securities portfolio. Therefore, the court does not treat the nonmarketable SPAC portfolio as qualified regulatory capital.

This conclusion rejects, for different reasons and to different degrees, each expert's treatment of cash and liquid assets. Atkins defined "excess cash" by reference to the approximately $44 million post-Merger dividend and treated the remaining balances as required for operations.[178] Although the dividend demonstrates that some cash was not needed, it does not establish that the remainder was. The dividend is a post-transaction event that may reflect considerations unrelated to fair value as of the Merger Date. *See In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 811 n.177 (Del. Ch. 2011) ("In an appraisal case, it is of course important to confine oneself to only information that was available as of the date of the transaction giving rise to appraisal."), *aff'd sub nom.*, *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). And Atkins does not demonstrate that the full amount of remaining liquid, allowable assets was necessary to sustain EarlyBird's operations. That premise is inconsistent with the record, which reflects both variability in capital needs and the availability of alternative

---

[178] Atkins Report ¶¶ 59–61; *id.* at 66; Tr. 459:4–16 (Atkins).

sources of regulatory capital. By treating nearly all remaining liquid balances fully captured within his earnings model, Atkins risks understating the value of assets whose economic contribution is not fully reflected in normalized earnings.

By contrast, Margolin's capitalization approach excludes cash, interest on cash, and investment balances from the operating cash flow stream used to estimate the value of EarlyBird's operating business, and then adds those items separately in moving to equity value. That structure is coherent within an income-based framework, particularly in the absence of reliable management projections. It has the virtue of transparency and allows the court to evaluate balance sheet assets directly. But Margolin's approach goes too far in the opposite direction. For a regulated broker-dealer, capital is not incidental to operations; it is an input into the earnings-generating process.[179] By adding back the full amount of liquid balances without accounting for the portion required to sustain operations, Margolin risks double-counting—*i.e.*, awarding stockholders both the present value of the business and the full value of the capital necessary to operate it.

The court therefore adopts an intermediate approach. It treats $30 million as regulatory capital embedded in the going concern value of the business and excludes that amount from any separate addition of EarlyBird's liquid, allowable assets. The

---

[179] *Valuing Financial Services Firms* 4–6 (explaining that regulatory capital is an operating constraint and that growth in financial firms requires reinvestment in equity capital).

54

remaining cash balances are treated as excess, non-operating assets and are added to equity value. This approach avoids the tensions in both experts' analyses. It does not treat regulatory capital as valueless, as Respondents' approach effectively does, nor does it assume that all balance sheet cash is distributable without consequence, as Petitioner's approach implies. Instead, it aligns the treatment of capital with both the economic realities of EarlyBird's business and the principles reflected in Delaware caselaw. It also avoids treating appraisal as a liquidation exercise. *See, e.g.*, *Paskill*, 747 A.2d at 554 (observing that "it is impermissible to appraise a corporation on the sole basis of its theoretical liquidation net asset value"); *In re Shell Oil Co.*, 607 A.2d 1213, 1221 (Del. 1992) ("Liquidation value is one factor relevant to a fair value inquiry and an acceptable technique, with others, upon which the Court of Chancery can rely. Liquidation value cannot, however, be viewed as a substitute for, or interchangeable with, fair value." (citation omitted)).

EarlyBird held $83,564,169 in cash for purposes of the valuation model. After reserving $30 million as operating and regulatory capital, $53,564,169 remained. Adding $506,824 of restricted cash and $7,001,717 of EBCH-level cash results in $61,072,710 of separately valued cash at the EarlyBird and EBCH levels. Firebrand separately held an additional $324,826 in cash. Because the cash was held directly by Firebrand, the court adds it after applying the cross-ownership allocation to the EBCH-level value.

55

### 3. Securities portfolio

The value of EarlyBird's securities portfolio is a central point of divergence between the parties' valuation frameworks. The dispute is rooted in a deeper disagreement about how the portfolio should be treated within the valuation exercise. Respondents argue that an asset-based valuation approach for the SPAC securities portfolio is irrelevant to Atkins's methodology because he values "EarlyBird's compensation into the future through the income statement, not through the balance sheet."[180] They contend that if the court were to perform an asset-based valuation of EarlyBird's securities, it should employ the "rights" methodology used by Cassel in July 2022, using data from May 24, 2022.[181] Although Respondents concede that "[t]he 'rights' data may not be a perfect proxy" since the "'rights' are freely tradable, while EarlyBird's nonmarketable securities are not," they also contend that "the rights data for marketable SPAC securities necessarily overestimates the value of EarlyBird's nonmarketable SPAC securities."[182] Petitioner, by contrast, treats the portfolio as a discrete non-operating asset and urges the court to rely on contemporaneous balance sheet values, subject only to a broad downward adjustment to reflect the deterioration of the SPAC market.[183]

---

[180] Resp'ts' Answering Br. 43–44.

[181] *Id.* at 46–52.

[182] *Id.* at 51.

[183] Pet'r's Opening Br. 37–47; Pet'r's Reply Br. 15–24.

The court does not accept Respondents' primary position that the balance sheet value of the portfolio is irrelevant because the securities should be valued only through the income statement.[184] Respondents' own record reflects that, before this litigation, EarlyBird and its auditor treated the nonmarketable securities as assets requiring third-party valuation for financial reporting purposes, and Atkins himself valued those securities as balance sheet items in his opening report.[185] But the court also does not accept Petitioner's position that the contemporaneous May 31, 2022, figures can be adopted without regard to the known deterioration in the SPAC market by the Merger Date.

The court begins with the contemporaneous evidence. As of May 31, 2022—one day before the Merger—EarlyBird reported approximately $44.9 million in securities and investments on its FOCUS Report.[186] Internal records maintained by Pendergast reflected a portfolio of approximately $38.8 million in "restricted" securities and approximately $6.1 million in other securities.[187] These values were assessed in the ordinary course of business for regulatory reporting purposes, not for

[184] *See* Resp'ts' Answering Br. 43–44.

[185] JX 148; Atkins Report at 70; Pet'r's Reply Br. 15–17, 24.

[186] JX 224 at 2 items 4.D., 5.B.

[187] JX 83 Tab "Investment Holdings 5-31-2022" Cell BA182–BA183; Margolin Report ¶ 28.

litigation. As such, they provide the most reliable starting point for assessing the portfolio's value as of the Merger Date.

At the same time, the contemporaneous record reveals that the portfolio was not a homogeneous asset. The FOCUS Report distinguishes between approximately $38.8 million in "securities and/or other investments not readily marketable" and approximately $6.1 million in "other securities."[188] The latter category consisted of securities that were freely tradable or otherwise liquid, whereas the former category comprised primarily restricted SPAC-related positions whose value depended on the successful completion of de-SPAC transactions. This distinction is critical. It permits a more refined valuation than either expert offered and better reflects the economic characteristics of the underlying assets.

Respondents rely heavily on analyses prepared by Cassel following the Merger, which reflect a dramatic decline in the value of the nonmarketable portfolio.[189] Those analyses revised earlier valuations downward—from approximately $36.9 million as of January 31, 2022, to as low as $5.6 million—based on reduced probabilities that SPACs would complete de-SPAC

---

[188] JX 224 at 2.

[189] *Compare* JX 148, *with* JX 320 Tab "Summary" Cell X59 *and* JX 352 at 19; JX 322a; JX 331 Tab "Summary" Cell X59; Margolin Report ¶¶ 27, 74.

transactions.[190] The court declines to adopt those post-Merger valuations as the operative measure of value. Although post-Merger evidence may be considered insofar as it helps validate or invalidate what was known or knowable as of the merger date, the July and August 2022 Cassel materials were prepared after the Merger and after Petitioner exercised appraisal rights. *See Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at \*5 (Del. Ch. Apr. 30, 2012) ("The [c]ourt should consider 'all factors known or knowable as of the Merger Date that relate to the future prospects of the Companies,' but should avoid including speculative costs or revenues." (quoting *In re U.S. Cellular Operating Co.*, 2005 WL 43994, at \*14 (Del. Ch. Jan. 6, 2005))). EarlyBird began questioning its valuation methodology only after the SPAC market deteriorated further and litigation risk had materialized. Moreover, the wide variation in the revised estimates underscores their sensitivity to subjective assumptions. In these circumstances, the court treats the post-Merger analyses as informative but not dispositive.

The same conclusion applies to Respondents' fallback "rights-data" approach. Respondents argue that "rights" are a better proxy for the value of EarlyBird's nonmarketable securities than Cassel's January 2022 de-SPAC probability method and urge the court, if it undertakes an asset-based valuation, to apply Cassel's July

---

[190] *See* JX 148 at 20; JX 320 Tab "Summary" Cell X59; JX 331 Tab "Summary" Cell X59; Margolin Report ¶¶ 27, 74.

2022 rights methodology using May 24, 2022, rights data.[191]  But Respondents themselves concede that rights are freely tradable, whereas EarlyBird's nonmarketable securities were not, and thus that rights data necessarily overstates the value of those nonmarketable holdings unless further discounted.[192]  That concession does not support Petitioner's proposed carrying value; it establishes only that the rights data cannot be applied directly without an additional adjustment for the illiquidity and restrictions affecting EarlyBird's holdings.  Petitioner, for his part, objects that the May 24 rights data materials were late-produced and insufficiently authenticated.[193]  The court need not resolve that evidentiary dispute because, even assuming the rights data are considered, they provide only a rough proxy and not a sufficiently reliable basis to displace the contemporaneous May 31, 2022, balance sheet evidence as the starting point for valuation.

The court must nevertheless account for market conditions as they existed on the Merger Date.  The evidence demonstrates that, by late May 2022, the SPAC market had already begun to deteriorate.  Deal activity had slowed, redemption rates were increasing, and regulatory uncertainty had introduced significant headwinds.  These developments would have affected the expected realizable value of

---

[191] Resp'ts' Answering Br. 46–52.

[192] *Id*. at 50–51.

[193] Pet'r's Reply Br. 19–22.

EarlyBird's nonmarketable securities, which depended heavily on successful de-SPAC transactions. At the same time, the evidence does not support incorporating the full extent of the subsequent deterioration of the SPAC market into the valuation as of the Merger Date.

The court concludes that no adjustment is warranted for the marketable portion of the portfolio. This does not double-count the marketable securities. The court's $30 million regulatory capital reserve is deemed satisfied first by cash. The marketable securities are therefore valued separately here. The approximately $6.1 million in "other securities" consisted of instruments that were freely tradable or otherwise liquid, and the record provides no basis to depart from their observed values. The nonmarketable portion of the portfolio presents a different case. Those positions were not readily convertible to cash at a known price. Their value depended on the successful completion of future transactions, the timing of those transactions, and prevailing market conditions at the time of exit. In addition, those positions were subject to liquidity constraints and valuation uncertainty, including the absence of reliable market pricing and the need to rely on assumptions about future deal outcomes. A hypothetical buyer as of the Merger Date would have discounted those positions to reflect their illiquidity, the uncertainty of successful de-SPAC completion, and the absence of reliable market pricing.

At the same time, the court does not accept Respondents' position that the nonmarketable portfolio should be valued based on the severely depressed figures reflected in the Cassel analyses. Those analyses incorporate information and market developments that post-date the Merger and rely heavily on probability adjustments that vary widely across iterations. Adopting those figures would effectively import hindsight into the valuation exercise.

The court's adjustment is also informed, but not controlled, by the trajectory of the post-Merger Cassel materials. Cassel's initial August 12, 2022, draft estimated the nonmarketable portfolio at approximately $29.6 million, approximately 23.7% below the $38.8 million reflected in the May 31, 2022, FOCUS Report.[194] That decline provides directional evidence that a downward adjustment was warranted for conditions already known or knowable as of the Merger Date. By contrast, Cassel's August 18 revision to approximately $5.6 million reflects a far more severe reassessment driven by post-Merger developments, which the court declines to import into its valuation.

No single record figure mechanically establishes a 30% adjustment. The court selects that percentage as a valuation judgment based on the conditions known or knowable as of the Merger Date, including the visible deterioration in SPAC activity,

---

[194] *Compare* JX 322a Tab "Summary" Cell X59, *with* JX 224 at 2 items 4.D, 5.B.

the increased risk that SPACs would not complete de-SPAC transactions, and the regulatory uncertainty confronting SPAC underwriters. The Cassel materials corroborate the direction of the adjustment, but they do not determine its magnitude.

Balancing these considerations, the court determines that a 30% downward adjustment to the contemporaneous valuation of the nonmarketable portfolio appropriately captures the Merger Date risks associated with SPAC positions whose realizable value depended on successful de-SPAC transactions in a market already under visible strain.[195] That adjustment accounts for known and knowable conditions as of the Merger Date without incorporating the full extent of the subsequent market decline. Applying the 30% adjustment to the nonmarketable portion and adding "other securities" results in an EarlyBird-level value of $33,308,432.70. EBCH separately held securities valued at $2,894,110.94. Therefore, the court includes total securities of $36,202,543.64 in its valuation.

### 4. Expense adjustment tied to the SEC proposal

Respondents' expert adjusted his normalized net income to increase expenses by $500,000 per year "because these additional diligence costs were reasonably foreseeable as of the Merger Date."[196] Atkins based his adjustment on testimony from Nussbaum and Levine that the SEC's March 30, 2022, proposed SPAC rules

---

[195] JX 224 at 2 items 4.D, 5.B; JX 322a Tab "Summary" Cell X59; *see also* JX 220; JX 282.

[196] Resp'ts' Answering Br. 37.

could increase underwriting-related diligence costs by approximately $150,000 per transaction.[197] Atkins then translated that testimony into a normalized annual expense adjustment of $500,000.[198]

The court accepts that the SEC's March 30, 2022 announcement introduced meaningful regulatory uncertainty and could reasonably have led market participants to anticipate higher underwriting costs going forward.[199] The record supports the proposition that the announcement affected market sentiment and created concern about increased underwriter liability and diligence burdens.[200] But the specific $500,000 annual adjustment has not been proven by a preponderance of the evidence. The estimate rests on generalized testimony about possible future cost increases, rather than contemporaneous documentary evidence that, as of the Merger Date, EarlyBird was reasonably expected to incur an additional $500,000 in recurring annual expenses.[201] Nor did Atkins identify a contemporaneous management estimate adopting that precise figure.

---

[197] Tr. 105:11–17, 106:1–5 (Nussbaum); Tr. 136:4–22 (Levine).

[198] Atkins Rebuttal Report ¶¶ 63–64; Atkins Report at 20; Resp'ts' Answering Br. 37.

[199] *See, e.g.*, JX 220; JX 282; Tr. 105:9–17 (Nussbaum); Tr. 136:4–22 (Levine).

[200] *See* Resp'ts' Sur-Reply Br. 39–40; Tr. 105:9–17 (Nussbaum); Tr. 136:7–22 (Levine).

[201] *See* Tr. 105:14–17, 106:1–5 (Nussbaum); Tr. 136:14–22 (Levine); *cf.* Resp'ts' Answering Br. 37 (relying on generalized management testimony rather than on contemporaneous budgets or projections).

The court therefore declines to adopt Atkins's proposed expense adjustment. Although the SEC's announcement suggested that the regulatory environment might become less favorable, the lack of supporting evidence renders the asserted $500,000 annual increase too speculative for inclusion in the valuation. *See Dole Food*, 114 A.3d at 550 (explaining that each party bears the burden of proving the constituent elements of its valuation position by a preponderance of the evidence). This conclusion does not imply that the proposed rules had no effect on value. The court accounts for the regulatory uncertainty and market deterioration associated with the March 30 announcement through the 2.0% perpetual growth rate used to determine operating value and through the downward adjustment to the nonmarketable securities portfolio.

### 5.    Subordinated debt

The parties also dispute whether certain subordinated loans should be treated as debt, which would reduce the equity value.[202] The record reflects approximately $2.9 million in subordinated loans from related parties at the EarlyBird level.[203] These instruments bear interest and are reflected as liabilities on the balance sheet.

---

[202] Resp'ts' Sur-Reply Br. 38–39; Pet'r's Reply Br. 30.

[203] Margolin Report ¶ 87; JX 316; Atkins Report ¶ 43; *id.* at 69.

Petitioner argues that these amounts should not reduce equity value, contending that they function more like regulatory capital than traditional debt.[204]

The court disagrees. Although subordinated debt may serve a regulatory function for broker-dealers, that does not alter its character as a contractual obligation for the business. These loans bore interest, were carried as liabilities, and represented claims senior to equity. Nothing in the record supports recharacterizing them as equity for appraisal purposes.

At the same time, the court recognizes that these instruments formed part of the capital structure and, in a practical sense, helped support its regulatory capital position.[205] That role does not make these loans disappear from the balance sheet, however. It simply means that the court must treat them consistently with the valuation framework and deduct them once in moving from the value of the business and its separately valued assets to the residual value available to equity holders. Accordingly, the court deducts $2.9 million for the subordinated loans in determining the residual EBCH-level value available to equity holders.

---

[204] Pet'r's Opening Br. 49 n.225; Pet'r's Reply Br. 30.

[205] Tr. 424:14–23 (Carr); *see also Neal v. Ala. By-Prods. Corp.*, 1990 WL 109243, at \*15 (Del. Ch. Aug. 1, 1990) (warning against double counting debt-related adjustments), *aff'd*, 558 A.2d 255 (Del. 1991).

### 6. The Share Dispute

Having determined the value of the operating business and the separately valued assets, the court now resolves the Share Dispute. The final pre-Merger reconciliation reflected 14,430,614 total Firebrand shares: 17,500 held by Firebrand itself, 7,096,210 held by EBCH, and 7,316,904 held by outside Firebrand stockholders. Both experts ultimately used the 7,316,904 outside Firebrand shares in translating allocable value to a per-share amount. Their disagreement concerned the portion of EBCH-level value attributable to those holders. Petitioner contends that Firebrand's entire 81.5% interest in EBCH should be allocated among the outside Firebrand shares. Respondents contend that the circular ownership structure requires a waterfall accounting for EBCH's outside stockholders, resulting in a 69.1% allocation.

"Outstanding share count forms the denominator by which the appraised-entity's total value must be divided." *Manichaean Cap., LLC v. SourceHOV Hldgs., Inc.*, 2020 WL 1166067, at *1 (Del. Ch. Mar. 11, 2020). Both experts ultimately used the same denominator—the 7,316,904 Firebrand shares held by outside stockholders. Their disagreement concerned the amount of EBCH-level value attributable to those shares through the circular ownership structure. The court reserved the resolution of that question until this part of the opinion.

67

As described above, Firebrand held 20,000,000 shares of EBCH, which represented 81.5% of EBCH on an as-converted basis. EBCH, in turn, held 7,096,210 shares of Firebrand, and Firebrand itself held 17,500 shares of its own stock. Petitioner contends that the Disputed Shares should be treated as treasury shares and that Firebrand's entire 81.5% interest should therefore be allocated among the 7,316,904 outside Firebrand shares.[206] Respondents contend that the Disputed Shares must be given economic effect through the waterfall, under which 69.1% of the EBCH-level value is attributable to the outside Firebrand stockholders.[207]

Under Section 160(a) of the DGCL, a "corporation may purchase, . . . own and hold, . . . its own shares." 8 *Del. C.* § 160(a). These shares are commonly referred to as "treasury shares."[208] "'Treasury stock' may be defined as shares that have been issued as fully paid and that have thereafter been acquired by the corporation by purchase or donation, but neither retired, cancelled, nor restored to the status of unissued shares."[209] "[T]reasury shares . . . shall be deemed 'issued'

---

[206] Pet'r's Opening Br. 50; *id.* App. 1 ¶ 27.

[207] Resp'ts' Answering Br. 10.

[208] James D. Cox & Thomas Lee Hazen, *The peculiar status of treasury shares*, 3 Treatise on the Law of Corporations § 21:9 (4th ed. 2025).

[209] *Id.*

but not 'outstanding.'"[210]  "Their existence as 'issued shares' is a pure fiction, a figure of speech to explain certain special rules and privileges as to their reissue."[211] "Treasury stock is in essence authorized stock that may be reissued as fully paid without some of the restrictions on an original issue of shares as to consideration and as to preemptive rights, if any."[212]  "Treasury shares go into something like a state of 'suspended animation' in that the corporation, although nominally the owner, cannot exercise certain rights of ownership, such as the right to vote or to receive dividends."[213]

Those principles, however, do not resolve the issue presented here.  This case does not concern only Firebrand's ownership of 17,500 shares of its own stock.  The parties agree that these are treasury shares and do not participate in the per-share allocation.  The harder question is how to treat, for appraisal purposes, the Disputed Shares in a circular holding-company structure in which both Firebrand and EBCH had outside investors.  The inquiry is which allocation best reflects Petitioner's pre-Merger proportionate economic interest in Firebrand's value as a going concern.

---

[210] William P. Hackney, *The Financial Provisions of the Model Business Corporation Act*, 70 Harv. L. Rev. 1357, 1399 (1957); *see also* 11 Fletcher Cyc. Corp. § 5080.80 (2025) ("[T]hey are not 'outstanding' shares.").

[211] Cox & Hazen, *supra*, § 21:9.

[212] *Id.*

[213] 11 Fletcher Cyc. Corp. § 5080.80 (2025) (collecting cases).

Petitioner argues that the court should value Firebrand "before anything happened with respect to the merger mechanics" and should reject any denominator that reflects the Merger's exchange ratio design rather than Firebrand's pre-Merger operative reality.[214] Petitioner emphasizes that Firebrand's audited consolidated financial statements for FY2012 through FY2019 consistently recorded the 7,096,210 Firebrand shares held by EBCH as "treasury stock," that EBCH's own audited financial statements described those shares as "essentially treasury stock," and that internal records, tax returns, franchise tax reports, and a valuation prepared in 2019 for estate planning and tax gifting likewise excluded those shares from the outstanding share count.[215] Petitioner also points to a Treasury regulation under Section 304 of the Internal Revenue Code of 1954, which provides that "[i]f a subsidiary acquires stock of its parent corporation from a shareholder of the parent corporation, the acquisition of such stock shall be treated as though the parent corporation had redeemed its own stock. For the purpose of this section, a corporation is a parent corporation if it meets the 50 percent ownership requirements . . . ." 26 C.F.R. § 1.304–3(a); *but see Stock Contemplated by Statute Imposing Tax Upon, or Measuring It by, Capital Stock*, 153 A.L.R. 686, 693 (1944) (annotation

---

[214] Pet'r's Opening Br. 53–54 & n.263 (quoting *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 65 (Del. 2022)).

[215] *Id.* at 9, 13–15, 17–23, 52 & n.259.

following *N. High Realty Co. v. Evatt*, 143 Ohio St. 231, 54 N.E.2d 783 (1944)) (indicating that treasury stock is considered issued and outstanding within the meaning of a franchise tax statute).  In Petitioner's view, that provision confirms the common-sense proposition that parent shares held by a subsidiary are not ordinarily treated as part of the outstanding shares.[216]  On that basis, Petitioner contends that counting the Disputed Shares in the Merger denominator simply diluted the outside Firebrand stockholders and caused them to receive fewer EBCH shares than their actual pre-Merger stake warranted.

Respondents counter that Petitioner's position treats the Disputed Shares as economically valueless and thereby disregards the interests of EBCH's outside minority stockholders.  Respondents highlight that Section 2.01 of the Merger Agreement expressly stated that the Firebrand shares "issued and outstanding" for purposes of the exchange ratio included the shares held by EBCH and any member of the EBCH Group, and that Section 2.04 excluded only shares held by Firebrand or its wholly owned subsidiaries, other than members of the EBCH Group, from the definition of "Treasury Stock."  Respondents also stress that both experts independently recognized the need to address the circular ownership through a cycling or waterfall approach.  At trial, Margolin agreed that the waterfall

_____

[216] *Id*. at 51 & n.256.

mathematics yielded the same 69.1% result as Atkins's model. Respondents contend that Petitioner's proposed treatment would award the outside Firebrand holders the full benefit of Firebrand's 81.5% share in EBCH while failing to account for the economic significance of the EBCH minority's interest.[217]

The court agrees with Petitioner on one important point: the Merger Agreement does not control the appraisal analysis. The court therefore does not accept Respondents' broadest contention that the agreement itself forecloses Petitioner's position as a matter of law. At the same time, the court does not accept the converse proposition that the historical accounting and tax treatment of the Disputed Shares as treasury stock resolves the issue. Appraisal presents a different question: How should the value held at the EBCH level be allocated between the outside Firebrand holders and EBCH's outside minority in a circular ownership structure?

The court also distinguishes between the company's capitalization records and the economic allocation issue. Respondents' evidence, including Kara Kennedy's report, supports the proposition that Firebrand's updated pre-closing capitalization records reflected a total of 14,430,614 Firebrand shares immediately before

---

[217] Resp'ts' Answering Br. 12–13; Resp'ts' Sur-Reply Br. 2–8.

72

closing.[218]   That evidence is relevant to determining what Firebrand's records reflected immediately before closing.  But it does not by itself answer the distinct appraisal question of how value attributable to the Disputed Shares should be treated within the circular ownership structure.  Kennedy's testimony, therefore, informs, but does not dictate, the economic allocation required in this appraisal analysis.[219]

The decisive point, in the court's view, is economic rather than semantic.  If the Disputed Shares are treated as having no economic effect in the allocation, then the outside Firebrand stockholders would receive the entire benefit of Firebrand's 81.5% stake in EBCH without accounting for the economic interest of EBCH's outside minority.  That approach would increase Petitioner's per-share slice.  But that increase would come only by disregarding the economic function of the cross-holding in a structure in which EBCH had outside minority investors.  The point of the waterfall is to address that circularity.  It is the mechanism through which value

---

[218] *See* JX 395 ("Kennedy Report") at 13–18; JX 150; JX 1017; JX 1019; JX 1021; JX 230a.

[219] Kennedy Report at 16–18 (opining that the authoritative master securityholder file showed 14,430,614 outstanding Firebrand shares on the Merger Date and that disclosure filings or communications could not alter that count); Resp'ts' Answering Br. App. 1 ¶¶ 146–149; JX 190.

is traced from EBCH to Firebrand while preserving the economic interest retained by EBCH's outside stockholders.[220]

The court is also persuaded that Petitioner's proposed treatment would be inconsistent with the fundamental appraisal principle that the court must determine Petitioner's proportionate interest in the fair value of the corporation as a going concern and not award a transaction-specific benefit that did not correspond to the pre-Merger economics. *Cavalier Oil Corp. v. Harnett*, 1988 WL 15816, at \*8 (Del. Ch. Feb. 22, 1988), *aff'd*, 564 A.2d 1137 (Del. 1989). Petitioner is correct that the Merger mechanics cannot dictate the answer. But Respondents are correct that a rule mechanically importing the treatment of treasury shares from accounting or taxation into this appraisal would overstate the outside Firebrand stockholders' economic claim. Even if the Disputed Shares were sterilized for voting or eliminated in consolidated reporting, that would not make them economically irrelevant in this valuation setting. In other words, their historical accounting and tax treatment does not justify excluding their economic effect from the allocation.

Accordingly, the court rejects Petitioner's proposal to allocate Firebrand's entire 81.5% interest in EBCH solely among the outside Firebrand shares without

---

[220] Tr. 331:11–17 (Margolin) ("[W]e're in agreement on that 69.1. We get there the same way. We come to the same number."); Tr. 441:1–442:14 (Atkins) (describing the waterfall and testifying that it yields at 69.1% ownership of the ultimate distribution); Resp'ts' Sur-Reply Br. 3–8 (arguing that the waterfall reflects pre-merger economic reality, not merely merger mechanics).

accounting for EBCH's minority holders.  The court instead adopts the waterfall approach reflected in the parties' expert analyses.  Under that approach, 69.1% of EBCH-level value is attributable to the outside Firebrand stockholders.

The experts' models treat assets held directly by Firebrand separately from the EBCH-level value subject to the waterfall, and the court follows that treatment here.  Therefore, Firebrand-level assets are added after application of the 69.1% allocation.

### 7.    Fair value

Applying the court's adjustments to the inputs produces an operating value of $22,441,012.87.  The court adds $61,072,710.38 of separately valued cash at the EarlyBird and EBCH levels and $36,202,543.64 of securities, and deducts $2,900,000 of subordinated debt.[221]  Those components produce an EBCH-level value of $116,816,266.89 before application of the cross-ownership allocation.  Applying the 69.1% allocation attributable to the non-EBCH holders of Firebrand stock yields $80,720,040.42.  The court then adds $324,826.33 of cash held directly

---

[221] The record consistently describes the related-party subordinated debt as $2.9 million.  The court notes that the amount that Margolin's Valuation Model included in "EBC 'Subordinated Loan' Debt Balance" was $2,894,110.94.  *See* Margolin's Valuation Model Cell P30.  That exact figure appears in the record as the value of EBCH-level securities.  *See* Margolin's Valuation Model Cell P29.  By contrast, Margolin repeatedly indicated the amount of "EBC Subordinated Debt" as "$2,900,000."  *See* Margolin Report at 50; Margolin Demonstrative (Dkt. 106) at 2, 5.  Therefore, the court adjusted the formula to use $2,900,000 for subordinated debt, consistent with the record evidence.  *See* JX 316; Atkins Report ¶ 43; *id.* at 69.

by Firebrand, producing a total value of $81,044,866.75 attributable to the outside Firebrand shares. Dividing that amount by 7,316,904 shares results in an unrounded fair value of $11.0763878755 per share, or $11.08 per share when rounded to the nearest cent.

## D. Prejudgment Interest

As the Delaware Supreme Court recently emphasized, "prejudgment interest is awarded as a matter of right, not by judicial discretion." *LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*, 2026 WL 935618, at *16 (Del. Apr. 7, 2026). Section 262(h) of the DGCL provides that:

> Unless the Court in its discretion determines otherwise for good cause shown, and except as provided in this subsection, interest from the effective date of the merger, . . . through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger, . . . and the date of payment of the judgment.

8 *Del. C.* § 262(h). The parties agree that Petitioner is entitled to interest on any award from the Merger Date until satisfaction of judgment at the applicable rate over

the Federal Reserve discount rate as established from time to time during that period.[222] They disagree on how the interest should be calculated.

"Section 262(h) permits a corporation to prepay appraisal claimants in an amount of the corporation's choosing to stop accrual of interest." *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 7704774, at \*12 (Del. Ch. Nov. 15, 2023), *aff'd*, 332 A.3d 349 (Del. 2024). Specifically:

> At any time before the entry of judgment in the proceedings, the surviving . . . entity may pay to each person entitled to appraisal an amount in cash, in which case interest shall accrue thereafter as provided herein only upon the sum of (1) the difference, if any, between the amount so paid and the fair value of the shares as determined by the Court, and (2) interest theretofore accrued, unless paid at that time.

8 *Del. C.* § 262(h). Here, Respondents have made two prepayments totaling $5,751,435.17, based on a $7.29 per-share fair value assumption and the associated prejudgment interest calculation.[223] On February 24, 2023, Respondents paid $2,346,749.17.[224] On July 15, 2024, Respondents paid $3,404,686.[225] According to Respondents, these prepayments take into account a period in which Petitioner forfeited interest pursuant to the parties' agreement.[226] At post-trial argument,

---

[222] Resp'ts' Pre-Trial Br. 71–73; Pet'r's Opening Br. 62–63 & n.310; Resp'ts' Answering Br. 59–60; Pet'r's Reply Br. 43–45.

[223] Pet'r's Opening Br. App. 1 ¶¶ 279–80; JX 1045 Tab "Summary" Cell D14, D25, Tab "PJI" Cells E19, E30; Tr. 476:18–20 (Atkins); Post-Trial Arg. at 93:17–94:1.

[224] JX 1045 Tab "Summary" Cell D14, Tab "PJI" Cell E19.

[225] *Id.*

[226] Tr. 476:21–23 (Atkins).

Petitioner explained that "there was an agreement between the parties to toll interest for a 90-day [*sic*] period and toll 60 percent interest during that time period."[227] Respondents' model to calculate prejudgment interest includes the language of the relevant provision, which states that:

> Petitioner agrees to forgo 60% of the prejudgment interest that would otherwise accrue during the 99-day extension the [*sic*] of the trial date (i.e., for the period of April 1 to July 9).  Thus, if $100 in prejudgment interest accrues between April 1 and July 9, Petitioner agrees to forgo $60 in interest.  Petitioner does not forgo interest outside that period.[228]

Petitioner argues that any prejudgment interest issue can be resolved when the parties finalize the implementing order after judgment and, if necessary, addressed through a joint letter submission.[229]  By contrast, Respondents contend that the court should adopt their calculation of prejudgment interest because they presented pertinent expert testimony at trial, unlike Petitioner.[230]

Respondents further submit that the court should exercise its discretion to toll prejudgment interest from July 9, 2024, to the new trial date because the trial was delayed twice, and neither delay is at all attributable to Respondents.[231]  "Adopting

---

[227] Post-Trial Arg. at 42:15–18; *see also id.* at 94:5–6 ("There was an agreed delay and deferral of interest rate at a reduced rate for a certain period of time.")

[228] JX 1045 Tab "PJI forfeiture clause."

[229] Post-Trial Arg. at 43:5–10.

[230] *Id.* at 92:20–93:16.

[231] Resp'ts' Pre-Trial Br. 72 ("With the delays in the trial, Gladstone has received at least four months of 'free' prejudgment interest at the extremely high statutory prejudgment interest rate."); Post-Trial Arg. at 94:7–24.

a different rate may be justified where it is necessary to avoid an inequitable result, such as where there has been improper delay or a bad faith assertion of valuation claims." *In re Appraisal of Metromedia Int'l Gp., Inc.*, 971 A.2d 893, 907 (Del. Ch. 2009); *see also Huff Fund Inv. P'ship v. CKx, Inc.*, 2014 WL 545958, at *2 (Del. Ch. Feb. 12, 2014) (explaining that "departure from the statutory interest rate [may be warranted] where there has been a demonstration of bad faith or vexatious litigation"), *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) (TABLE). But this is not the case here. Respondents have not demonstrated that Petitioner engaged in litigation conduct that would warrant the departure from the statutory interest rate.

Therefore, the court awards prejudgment interest from the Merger Date through the date of payment at the statutory rate, subject to the parties' agreed 60% reduction during the 99-day period. The final judgment should credit the two prepayments effected on February 24, 2023, and July 15, 2024, and calculate interest accordingly. The parties shall confer and submit a conforming calculation with the implementing order.

### E. Costs and Fees

Under Section 262(j) of the DGCL,

[t]he costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon application of a [petitioner] . . . who participated in the proceeding and incurred expenses in connection therewith, the Court may order all or a portion of such expenses, including, without limitation, reasonable attorney's fees and the fees and expenses of

79

experts, to be charged pro rata against the value of all the shares entitled to an appraisal . . .

8 *Del. C.* § 262(j).

### 1. Costs

Petitioner's shares are the only shares entitled to appraisal. Petitioner argues that he is entitled to his costs pursuant to Court of Chancery Rule 54(d).[232] Respondents counter that each party should bear its own fees and costs.[233] Under Rule 54(d), "[u]nless a statute, these Rules, or a court order provides otherwise, costs should be allowed to the prevailing party." Ct. Ch. R. 54(d). "A successful litigant is not entitled to reimbursement under Chancery Rule 54(d) merely because the expenditure was necessary to the prosecution, maintenance and presentation of the case." *Gaffin v. Teledyne, Inc.*, 1993 WL 271443, at *1 (Del. Ch. July 13, 1993). "Prevailing party costs under Rule 54(d) do not cover all litigation expenses, but rather, only those 'necessarily incurred in the assertion of [the prevailing party's] rights in court.'" *Mindbody*, 2023 WL 7704774, at *13 (citing *Donovan v. Del. Water & Air Res. Comm'n.*, 358 A.2d 717, 723 (Del. 1976)). The Court of Chancery retains "wide discretion in awarding or apportioning costs in each particular case." *BV Advisory P'rs, LLC v. Quantum Computing Inc.*, 2025 WL 554760, at *2 (Del.

---

[232] Pet'r's Opening Br. 63; Pet'r's Reply Br. 43.

[233] Resp'ts' Sur-Reply Br. 44.

Ch. Feb. 19, 2025) (citation modified) (quoting *Adams v. Calvarese Farms Maint. Corp.*, 2011 WL 383862, at *3 (Del. Ch. Jan. 13, 2011)).

The present case involves a stock-for-stock merger in which the merger value was expressed in a conversion ratio.[234] But Respondents contended that the fair value of Firebrand was no more than $7.29 per share.[235] Having determined that the fair value of Firebrand is approximately $11.08 per share, the court concludes that it is equitable to award Petitioner his costs under Section 262(j). Those costs are limited to those that are allowed under Rule 54(d).

### 2. Leave to file a motion for attorneys' and expert fees

"Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation." *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 545 (Del. 1998). "The courts of this nation, including th[e] [Delaware Supreme] Court, have recognized several exceptions to the American Rule." *Id.* One of these exceptions "is the bad faith exception." *Id.* "[C]ourts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Id.* at 546 (citation modified).

---

[234] Merger Agreement § 2.01.

[235] Resp'ts' Sur-Reply Br. 3; Post-Trial Arg. at 95:5−9.

Petitioner seeks leave to file a motion for his attorneys' and expert fees under the bad faith exception to the American Rule.[236] Respondents counter that Petitioner's fee-shifting request is frivolous, and that Petitioner's allegations of Respondents' purported bad faith lack grounding in fact and law.[237] As the Delaware Supreme Court has held in *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 301 (Del. 1996), "[i]n the absence of an equitable exception, the [petitioner] in an appraisal proceeding should bear the burden of paying its own expert witnesses and attorneys."

A leading treatise has noted that "[t]here appears to be only one instance in which a Delaware court imposed the costs of an appraisal petitioner's experts and attorneys upon the surviving or resulting corporation." 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.11[e] (2026). The cited case is *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 227 (Del. 2005), where the Delaware Supreme Court found that the respondents' prelitigation conduct not only led to the unfairly low price that required the minority stockholders to initiate the appraisal action but also compounded bad faith litigation conduct. Specifically, the Court pointed to the CEO's lying under oath and allowing the destruction of documents to obstruct the

---

[236] Pet'r's Opening Br. 61–62; Pet'r's Reply Br. 42–43.

[237] Resp'ts' Answering Br. 59–60.

petitioners' efforts to uncover evidence of the company's true value, the respondents' repeated refusal to produce documents that had been requested in discovery, and the introduction of expert valuation testimony that the Court of Chancery had found "fatally flawed" in both its methodology and its data. *Id.* at 228–29.

Nothing of the sort occurred here. Both sides vigorously disputed a number of factual, valuation, and legal issues. Respondents' litigation conduct does not warrant fee shifting. Respondents did not engage in bad faith conduct. Therefore, Petitioner's request for attorneys' and expert fees is denied.

## III. CONCLUSION

The court determines that the fair value of Firebrand as of June 1, 2022, was $11.0763878755 per share. Petitioner perfected appraisal rights as to 693,165 shares of Firebrand common stock. Petitioner is therefore entitled to an appraisal award of $7,677,764.40, plus prejudgment interest at the statutory rate, subject to the parties' agreed 60% reduction during the 99-day period and credit for Respondents' prepayments. Petitioner is also awarded taxable costs. Petitioner's request for attorneys' and expert fees under the bad faith exception to the American Rule is denied. The parties shall confer and submit, within ten days, a form of final order implementing this memorandum opinion and setting forth the resulting calculations.